# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Corporate Commission of the Mille
Lacs Band of Ojibwe Indians,

                        Plaintiff,        Civ. No. 12-1015 (RHK/LIB)
**MEMORANDUM OPINION
AND ORDER**

v.

Money Centers of America, Inc. and MCA
of Wisconsin, Inc.,

                        Defendants.

Jane E. Maschka, Michael M. Krauss, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Plaintiff.

Luke P. McLoughlin, James L. Beausoleil, Jr., Duane Morris LLP, Philadelphia, Pennsylvania, Robert B. Patterson, Jr., Patterson Law Office, Minnetonka, Minnesota, for Defendants.

## INTRODUCTION

Plaintiff Corporate Commission of the Mille Lacs Band of Ojibwe Indians ("the Commission") retained Defendants Money Centers of America, Inc. and MCA of Wisconsin, Inc. (collectively "MCA") to perform cash-access services for the Commission in its casinos. As part of their agreement, the Commission advanced MCA cash from its vault for the transactions and MCA would later wire the money back to the Commission, minus its fees. MCA took longer and longer to return the cash, until finally the Commission terminated their agreement and commenced this litigation, alleging

breach of contract, fraud, and various other claims. MCA now moves to dismiss three of the Commission's claims. For the reasons that follow, the Court will grant the Motion in part.

## BACKGROUND

**The Parties' Agreement and Cash Advance Schedule**

On April 17, 2009, the Commission and MCA entered into a three-year contract ("the Agreement") for MCA to provide cash-access services at the Commission's casinos. (Am. Compl. ¶ 11.) The Agreement provided that the Commission would advance MCA cash from its on-site vaults so MCA could provide "check cashing, credit/debit card advances and other cash access services" to casino guests. (Am. Compl. Ex. A, § 8.) The cash was not to be used for any other purpose. (Id. § 15.)

Under the Agreement, MCA was to return the money to the Commission by electronic transfer "in accordance with the Vault Cash Settlement Schedule to be provided by MCA" to the Commission "prior to the first advance." (Id. § 8.) On May 30, 2009, MCA provided the Commission with the following schedule, which the Commission asserts is the Vault Cash Settlement Schedule (or, the "Schedule") referred to in the Agreement:

|                 |        | Credit Cards    |          |
| --------------- | ------ | --------------- | -------- |
| Date Transacted | Checks | Visa/Mastercard | Discover |
| Mon             | Fri    | Wed             | Thurs    |
| Tue             | Mon    | Thurs           | Fri      |
| Wed             | Tues   | Fri             | Mon      |
| Thu             | Wed    | Mon             | Tues     |
| Fri             | Wed    | Tues            | Wed      |
| Sat             | Wed    | Tues            | Wed      |
| Sun             | Wed    | Tues            | Wed      |

(Am. Compl. Ex. B.) This Schedule was part of an excel file labeled "ABC Casino" that also illustrated what a hypothetical month of transactions between the parties would look like. (Id.) MCA sent this file to the Commission with an email stating that MCA would be "initiating wires to [the Commission] based on the attached schedule." (Id.) The Commission alleges that, based on this Vault Cash Settlement Schedule, MCA promised to repay each cash advance within four to six days.

During the course of their relationship, the Commission advanced money to MCA nearly every day. (Am. Compl. ¶ 18.) The amount of each advance varied, as it was based on MCA's estimate of how much cash it needed for the day. (Id.) "The Agreement and Vault [Cash] Settlement Schedule necessarily resulted in MCA holding a certain amount of the Commission's Vault Cash on any given day." (Id. ¶ 20.)

**MCA's Failure to Timely Return the Commission's Money**

Soon after MCA began operating in the casinos, it was "breaching its promise to return the Vault Cash within six (6) days." (Id. ¶ 21.) The delays in repayment caused the total amount of money MCA owed to the Commission on any given day to increase over time. For example, during June and July of 2010, it took MCA an average of seven days to repay the advances, and MCA was holding $2.9 million of the Commission's money. (Id. ¶ 30.) In contrast, during June and July of 2011, it took MCA an average of twelve days to repay the advances, and MCA was holding $4.7 million of the Commission's money. By 2011, "MCA's prolonged withholding of Vault Cash beyond the agreed-upon period caused [the Commission] cash flow issues." (Id.)

The Commission and MCA discussed the repayment schedule and MCA's delays on at least two occasions. On June 14, 2010, the parties spoke over the phone about MCA's delays in repayment and "an MCA[] employee again confirmed that Vault Cash should be reimbursed within six (6) days." (Am. Compl. Ex. C.) Nevertheless, MCA continued to delay repayment. On February 16, 2011, MCA acknowledged the "delay in settlements" in a letter to the Commission and suggested that an increase in its fees could help improve the turn-around time. (Am. Compl. Ex. D.) MCA also suggested in this letter that it was not using the Commission's cash advances for strictly cash-access purposes; it referred to using the cash "to fund . . . working capital." (Id.)

On October 13, 2011, the Commission sent MCA a Notice of Breach informing it of its failure to comply with the Vault Cash Settlement Schedule and allowing it thirty days to cure the breach before termination, as provided for in the Agreement. (Am. Compl. ¶ 32.) Notwithstanding the foregoing, MCA continued to delay its return of the Commission's advances. (Id.) On April 2, 2012, the Commission terminated the Agreement and demanded return of the outstanding vault cash advances totaling $5,623,687.83. (Id. ¶¶ 33–34; Am. Compl. Ex. G.) To date, MCA has not returned this money to the Commission. (Am. Compl. ¶ 34.)

**MCA's Alleged Fraudulent Statements**

The Mille Lacs Band Gaming Regulation Authority ("the GRA") is an independent tribal agency in charge of licensing vendors for operation in the Commission's casinos. (Id. ¶ 36.) In the Agreement, MCA warranted that it would meet all regulatory requirements of the Commission, which included obtaining the necessary

approvals from the GRA. (Am. Compl. Ex. A, § 23(a).) The Agreement was "subject to immediate cancellation" if the GRA did not license MCA. (Id. § 36.)

Some time prior to January 2012, MCA applied to the GRA to renew its vendor license. (Am. Compl. ¶ 38.) Among other things, the application required MCA to disclose: the status of its licenses in other jurisdictions; its litigation history; "[d]etails of any denial, restriction, suspension, revocation or nonrenewal of a license or certificate held by the applicant or the applicant's Substantial Owners;" and whether it had been questioned by a city, county, state, federal or law enforcement agency. (Id. ¶ 40; Am. Compl. Ex. J.) MCA also had a continuing duty to notify the GRA of any changes to the information in its application. (Am. Compl. Ex. J.) The Commission alleges that MCA did not accurately disclose and/or update this information in its application in several respects.[1]

First, MCA represented that it had been granted a gaming-related contractor certificate by the State of Wisconsin when it had not. (Am. Compl. ¶ 39.) MCA failed to renew its certificate in September 2011, and the State of Wisconsin concluded in January 2012 that it was not "entitled to hold, or be affiliated with a company that holds, a temporary certificate" either. (Id.) Second, MCA represented that it had not been questioned by a city, county, state, or federal law enforcement agency when it had been. (Id. ¶ 40.) The State of Wisconsin had investigated MCA and took sworn testimony from

---

[1] At oral argument, the Commission offered a copy of MCA's license application and pointed to specific misrepresentations in it. Because the application was not presented to the Court until oral argument and was not discussed in the parties' briefs, the Court has not considered it in deciding this Motion. (See 10/4/12 Hr'g Tr. 8–9, 20–21, 29–31.)

several of its employees and officers, and the FBI had investigated MCA's Chief Executive Officer in connection with a criminal investigation. (Id. ¶¶ 40–41; see Am. Compl. Exs. K, L.) Third, MCA did not disclose any lawsuit to which it was a party, notwithstanding that the Ho Chunk Nation had a lawsuit pending against it at the time. (Am. Compl. Exs. K, L.)

The GRA approved MCA's application containing these allegedly false statements and granted MCA a vendor license. (Am. Compl. ¶ 38.) The Commission did not discover this until after commencing this litigation. (Id. ¶ 35.)

**The Instant Action**

After terminating the Agreement and demanding repayment, the Commission commenced this action against MCA in April 2012. In its Amended Complaint, the Commission asserts claims for breach of contract (Count I), unjust enrichment (Count II), conversion (Count III), replevin (Count IV), constructive trust (Count V), and fraud (Count VI). MCA now moves to dismiss Counts I, IV, and VI.

## STANDARD OF DECISION

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 547. A "formulaic recitation of the elements of a cause of action" will not suffice. Id. at 555; accord Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at

678 (quoting Twombly, 550 U.S. at 556).

When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556). The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff. Twombly, 550 U.S. at 554–56. A complaint should not be dismissed simply because the Court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations. Id. at 556. Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is very remote and unlikely. Id. "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).

## ANALYSIS

**I.  Breach of Contract**

Count I of the Commission's Amended Complaint asserts a claim for breach of contract. Under the Mille Lacs Band of Ojibwe Statutes,[2] a party may bring a claim for breach of contract if the other party "does not perform a promise pursuant to the terms of the contract." 24 MLBS § 119. The Commission alleges that MCA's conduct breached

---

[2] The Agreement states that it is governed by Mille Lacs law where applicable. (Am. Compl. Ex. A. § 30.) Under Minnesota law, the Court honors a contract's choice-of-law clause. E.g., Hagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 48 (Minn. Ct. App. 1994).

four provisions of the Agreement, and MCA moves to dismiss two of those allegations, which the Court will address in turn.

The Commission first alleges that MCA breached the Agreement by consistently failing to repay cash advances according to the Vault Cash Settlement Schedule. Specifically, it alleges that the schedule from the excel file labeled "ABC Casino" constituted the Vault Cash Settlement Schedule and that MCA was bound to follow it by the terms of the Agreement. The Agreement states, "MCA shall electronically transfer funds to the CORPORATE COMMISSION's designate[d] gambling facility in settlement of each vault cash advance in accordance with the Vault Cash Settlement Schedule to be provided by MCA to CORPORATE COMMISSION prior to the first advance." (Am. Compl. Ex. A, § 8(a).)

MCA argues that the Court should dismiss this claim because "the parties never set *binding* dates for the return of funds, thus there was no timetable [for MCA] to breach." (Defs.' Mem. 11.) It acknowledges that the excel file was the Vault Cash Settlement Schedule (10/4/12 Hr'g Tr. 6), but contends that the days in the Schedule "are, at best, estimates of when funds would be returned." (Defs.' Mem. 11.) MCA argues the Schedule cannot be binding because it "literally only lists days of the week, not any obligations or even words such as 'due by,' 'owing on,' 'returnable by,' and so on." (Id. at 12.)[3] But there are no magic words that the Commission must plead; it need only

---

[3] MCA also argues that the parties' subsequent conduct and industry standards prove that the Schedule was not binding, relying on matters beyond the Amended Complaint. However, on a motion to dismiss, the Court may only consider the facts alleged in the Amended Complaint, and the Court must view them in the light most favorable to the

allege facts indicating the parties agreed to follow a certain course of conduct. See 24 MLBS § 101 ("A contract is an agreement, upon sufficient consideration, to do or not do a particular thing. It may be oral or written . . . .").

The Commission pleaded that MCA agreed to a binding Schedule. In support of its claim, it relies on the wording of the Agreement ("MCA *shall* electronically transfer . . . ") (Am. Compl. Ex. A, § 8 (emphasis added)); MCA's email advising the Commission, "We will be initiating wires to you based on the attached schedule" (Am. Compl. Ex. B.); and the Schedule itself, which lists specific days. These facts are more than adequate, in the Court's view, to support the Commission's claim.

The Commission also alleges that, in the event the Court determines the parties did not establish a Vault Cash Settlement Schedule, MCA breached the Agreement by failing to provide one. MCA moves to dismiss this claim on grounds that are, in the Court's opinion, unintelligible. However, because MCA acknowledged at oral argument that the parties had a Vault Cash Settlement Schedule (10/4/12 Hr'g Tr. 6), the Commission's claim is moot and the Court will dismiss it accordingly.

---

Commission. See, e.g., Braden, 588 F.3d at 594.

MCA also includes, unmoored from any of its arguments, a long string of citations to cases from this Court and this district dismissing breach-of-contract claims: Olen v. Northern Tier Retail, LLC, Civ. No. 11-2665, 2012 U.S. Dist. LEXIS 62532, at *17 (D. Minn. May 4, 2012) (Frank, J.), Pliam v. Cendant Mortg. Corp., Civ. No. 11-3720, 2012 U.S. Dist. LEXIS 58222, at *7–8 (D. Minn. Apr. 26, 2012) (Kyle, J.), Olivares v. PNC Bank, N.A., Civ. No. 11-1626, 2011 U.S. Dist. LEXIS 118338, at *15 (D. Minn. Oct. 13, 2011) (Montgomery, J.), Zieper v. Kingsway Fin. Servs., Civ. No. 11-362, 2011 U.S. Dist. LEXIS 86472, at *7 (D. Minn. Aug. 4, 2011) (Frank, J.), Shukh v. Seagate Tech., LLC, Civ. No. 10-404, 2011 U.S. Dist. LEXIS 33924 (D. Minn. Mar. 30, 2011) (Tunheim, J.), and Motley v. Homecomings Fin., LLC, 557 F. Supp. 2d 1005, 1013 (D. Minn. 2008) (Kyle, J.). None of these is sufficiently similar to the instant case to be persuasive.

## II. Replevin

Count IV asserts a claim for replevin to recover the money MCA allegedly owes the Commission under the Agreement. MCA moves to dismiss this claim under the Agreement's choice-of-law clause. The clause states:

> This Agreement and all rights and obligations herein shall be governed in accordance with applicable laws of The Mille Lacs Band of Ojibwe, or in the absence of written law thereof the laws of the federal government of the United States of America, or in the absence thereof, the . . . Laws of the State of Delaware.

(Am. Compl. Ex. A. § 30.) Under Minnesota law, the Court honors a contract's choice-of-law clause provided it was entered into in good faith. E.g., Hagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 48 (Minn. Ct. App. 1994). Accordingly, the Court will follow the Agreement and first determine if Mille Lacs law applies to the Commission's replevin claim.

The Mille Lacs Band of Ojibwe Statutes provide for a replevin claim, but limit such a claim to cases before the Mille Lacs court. 24 MLBS § 3501 ("**Applicability.** The replevin procedure set out in this subchapter shall be utilized for all cases before the Court of Central Jurisdiction."). MCA argues that the Court must apply Mille Lacs law under the choice-of-law clause because "replevin is not absent from [the Mille Lacs statutes]." (Defs.' Mem. 16.) MCA also argues that the Commission cannot actually utilize the Mille Lacs replevin procedure in this case because it is only available in cases before the Mille Lacs court. (Id.) Therefore, MCA concludes, replevin is simply "not available in this proceeding" and the Court should dismiss the Commission's claim. (Id.) In other words, MCA argues that the Court should first determine that Mille Lacs law

- 10 -

applies and, for that reason, preclude state and federal replevin claims; then, it should determine that Mille Lacs law does *not* apply and, for *that* reason, preclude a tribal replevin claim too.

But MCA cannot have it both ways—Mille Lacs law either does or does not apply to the Commission's replevin claim, and the Court concludes that it does not. The Agreement specifies that it shall be governed by "applicable laws" of the Mille Lacs Band. Because the Mille Lacs replevin subchapter explicitly limits its applicability to "cases before the Court of Central Jurisdiction," which this is not, Mille Lacs law is not applicable here. Therefore, the Commission may advance its claim for replevin pursuant to either federal or state law, neither of which MCA's argument addresses.

### III. Fraud

Count VI alleges a claim for fraud based on MCA's alleged false statements in its vendor-license application to the GRA. Under Mille Lacs law, "[o]ne who willfully deceives another, with intent to induce him to change his position to his injury or risk, is liable for any damage which that person suffers." 24 MLBS § 401. The elements of a fraud claim are:

> (a) [The statement] was made as a statement of fact, not mere opinion;
> (b) It was untrue and known to be untrue by the party making it or else recklessly made;
> (c) That it was made with the intent to deceive and for the purpose of inducing the other party to act upon it;
> (d) That the plaintiff was reasonably entitled to rely upon said statement and did so;
> (e) That he was thereby induced to act upon the statement; and
> (f) He suffered injury or damage.

24 MLBS § 402.

The Commission alleges that MCA fraudulently represented to the GRA that: (1) it had been granted a gaming-related contractor certificate by the State of Wisconsin (Am. Compl. ¶ 39); (2) it had not been questioned by a city, county, state, federal or law enforcement agency (id. ¶ 40); and (3) it was not a party to any lawsuit (id. ¶ 38). The Commission alleges that, had MCA answered honestly, the GRA would not have granted it a vendor license and the Commission would have immediately canceled the Agreement, as it was entitled to under its terms. (Am. Compl. Ex. A. § 36 ("This Agreement is subject to immediate cancellation if the [GRA] cannot license [MCA].").) The Commission alleges that MCA knew this and lied on its application to prevent it.

MCA argues the claim should be dismissed because the Commission did not plead it with particularity, as required by Federal Rule of Civil Procedure 9(b). That rule provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This means a "party must typically identify the 'who, what, where, when, and how' of the alleged fraud." BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007). The Court determines that the Commission identified each of the elements; it alleged who made the statements (MCA), what was said (see Am. Compl. ¶¶ 38–41), to whom (the GRA), when (January 2012), and where (in its vendor-license application). To the extent that MCA argues that the Court should dismiss the claim because the Commission does not "adduce facts (with any particularity) showing that a statement was 'made with the intent to deceive,'" MCA ignores the rest of Rule 9(b), which clearly states that "intent . . . may be alleged generally."

MCA next argues that the Commission has not pleaded a plausible allegation of detrimental reliance. The Commission alleges that, but for the misrepresentations, it would have cancelled the Agreement in January 2012 and would not have continued to advance money to MCA between January and April 2012. MCA argues this claim "is not plausible because the Commission had already noticed a breach of contract in October 2011, *prior to* the time (January 2012) that it now claims it would have ended its relationship with MCA." (Defs.' Mem. 16–17.) At this stage, the Court views the facts in the light most favorable to the Commission. From this perspective, the October notice of breach does not undermine the Commission's allegation that it would have canceled the Agreement, but rather reinforces it—MCA losing its vendor license would have been the proverbial straw that broke the camel's back. Indeed, the Commission kept advancing MCA money after noticing a breach in October 2011.

Finally, MCA argues that the Commission cannot show it was reasonably entitled to rely on MCA's statements because the Commission admits that it never heard them.[4] Direct communication between the defendant and plaintiff is not necessary for a fraud claim, however, and a defendant may be liable for making fraudulent misrepresentations to a third party if it intended or had reason to expect that they would be communicated to

---

[4] The Mille Lacs statutes do not address whether a claim for fraud can succeed without direct communication between the plaintiff and defendant; the parties instead cite to the Restatement (Second) of Torts and Minnesota law. Mille Lacs' and Minnesota's definitions of fraud are similar to the Restatement's definition, so the Court will apply the rule of the Restatement. See Restatement (Second) of Torts § 525 ("One who fraudulently makes a misrepresentation of fact . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.")

the plaintiff and influence the plaintiff's conduct.  See Restatement (Second) of Torts § 533 ("Representation Made to a Third Person"); accord, e.g., Viske v. Flaby, 316 N.W.2d 276, 283 (Minn. 1982) (upholding verdict in favor of plaintiffs because jury could have reasonably concluded that defendants did not disclose material facts to third party "despite the fact that appellants knew unsophisticated individuals such as [plaintiffs] would rely on [the third party's] knowledge" when deciding to invest); Kronebusch v. MVBA Harvestore Sys., 488 N.W.2d 490, 496 (Minn. Ct. App. 1992) (trial court did not err in providing jury instructions on indirect intentional misrepresentations based on the Restatement (Second) of Torts §§ 533–34 where defendant had no direct contact with the buyers but its representations were passed on through local dealer); but cf. Schaaf v. Residential Funding Corp., Civ. No. 05-1319, 2006 U.S. Dist. LEXIS 98754, at *52–53 (D. Minn. July 27, 2006) (Report & Recommendation of Nelson, M.J.) adopted by 2006 U.S. Dist. LEXIS 61970 (D. Minn. Aug. 29, 2006) (Ericksen, J.) (plaintiff's reliance on third party's "implicit representation, by underwriting the [d]ebentures," that they were a worthy investment was too tenuous to sustain a claim of fraud).  Accordingly, the question becomes whether MCA's misrepresentations were "communicated" to the Commission, even though, as MCA points out, the Commission never heard or received the statements.

Comment (f) to Restatement § 533 is illustrative.  It explains that this rule of "indirect" fraud is often used to allow a plaintiff who extends credit to a defendant in reliance on the defendant's good credit rating to recover damages if the defendant made misrepresentations to the credit-rating company for the purpose of obtaining a better

- 14 -

rating. Restatement (Second) of Torts § 533 cmt. f. In such situations, the fact that the misstatements themselves are not repeated to the plaintiff is immaterial. Id. "It is enough that their substance is summarized with reasonable accuracy or that the rating given expresses the effect of the misstatements made." Id. The Court views the facts of the instant case as comparable to the situation described above. In the Restatement's hypothetical, the defendant would not have received a good credit rating but for his misrepresentations, so the credit rating "expresses the effect of the misstatements made." Likewise, in the instant case, MCA (allegedly) would not have received a vendor license but for its misrepresentations, so the license also "expresses the effect of the misstatements made." Accordingly, the Commission has adequately pleaded a fraud claim based on MCA's misrepresentations to the GRA.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that MCA's Motion to Dismiss (Doc. No. 53) is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** as to the Commission's claim that MCA breached the Agreement by failing to provide a Vault Cash Settlement Schedule and that claim is **DISMISSED WITH PREJUDICE**. The remainder of MCA's Motion is **DENIED**.

Dated: November 7, 2012               s/Richard H. Kyle
                                      RICHARD H. KYLE
                                      United States District Judge