# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Corporate Commission of the Mille
Lacs Band of Ojibwe Indians,

|  |  |  |
|---|---|---|
|  | Plaintiff, | Civ. No. 12-1015 (RHK/LIB) |
|  |  | **MEMORANDUM OPINION AND ORDER** |
| v. |  |  |
| Money Centers of America, Inc., et al., |  |  |
|  | Defendants. |  |

Jane E. Maschka, Michael M. Krauss, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Plaintiff.

Erin M. Carter, Luke P. McLoughlin, James L. Beausoleil, Jr., Duane Morris LLP, Philadelphia, Pennsylvania, Robert B. Patterson, Jr., Patterson Law Office, PA, Minnetonka, Minnesota, for Defendants.

## INTRODUCTION

This action arises from an agreement among Defendants Money Centers of America, Inc. and MCA of Wisconsin, Inc. (collectively "MCA") and Plaintiff Corporate Commission of the Mille Lacs Band of Ojibwe Indians (the "Commission") for MCA to provide cash-access services to patrons in the Commission's casinos. The Commission would advance MCA cash from the casino vaults for it to use in transactions with casino patrons. Then, MCA would deduct its fees from the amounts received from patrons and transfer the balance back to the Commission. Over the course of the parties' three-year relationship, MCA fell behind on its repayments, causing the Commission to ultimately

terminate the Agreement and initiate this action.  The Commission asserts breach-of-

contract, fraud, and related claims against MCA and other Defendants related to MCA,

seeking repayment of its outstanding cash advances, totaling $5.6 million.  In response,

MCA asserts a host of counterclaims against the Commission for prematurely terminating

their agreement.  The Commission now moves for summary judgment on two of its

claims (breach of contract and unjust enrichment) and all of MCA's counterclaims, while

MCA cross-moves for partial summary judgment on the Commission's same two claims.

For the reasons set forth below, the Court will grant each Motion in part and deny each in

part.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

On April 17, 2009, the Commission and MCA entered into a three-year contract

("the Agreement") for MCA to provide cash-access services at the Commission's

casinos, Grand Casino Mille Lacs and Grand Casino Hinckley.  The Agreement provided

that the Commission would advance MCA cash from its on-site vaults and MCA would

provide that cash to casino customers in exchange for payment by check or credit/debit

card at its designated booths on the casino floors.  Then, MCA would deduct fees from

the amount advanced and "electronically transfer funds to the [Commission]'s

designate[d] gambling facility in settlement of each vault cash advance in accordance

with the Vault Cash Settlement Schedule to be provided by MCA to [the Commission]

prior to the first advance."  The parties agreed on a Vault Cash Settlement Schedule,

which gave MCA four to six days to repay the Commission's advances.

During the course of their relationship, the Commission advanced money to MCA on an almost daily basis.  Soon after the Agreement took effect, MCA began taking longer than six days to repay its advances.  The delays in repayment caused the total amount of money MCA owed to the Commission on any given day to increase over time. The Commission and MCA discussed the repayment schedule and MCA's delays on several occasions but the Commission continued to accept MCA's payments and allow MCA to operate in its casinos.  Mark Wolfington, MCA's corporate representative, testified that the parties were in "constant conversation" about MCA's timeliness and that it was a "sore spot" for the Commission.  (M. Wolfington Dep. 145, 192.)  In October 2011, after more than two years, the Commission sent MCA a written notice of breach, informing MCA of its failure to comply with the Vault Cash Settlement Schedule and allowing it thirty days to cure the breach before termination, as provided by the Agreement.  Within the next thirty days, MCA repaid the advances that were outstanding at the time it received the notice but continued to delay settlement of the Commission's subsequent advances during that time.  After the thirty-day period expired, the Commission took no immediate action to terminate the relationship.

The purposes of the parties' Agreement were (ostensibly) two-fold.  It was not merely for MCA to provide the Commission cash-access services, but also to transition those services to the Commission's control so it could manage the booths and operations itself using MCA's system.  This would be advantageous for MCA because it would continue to earn fees as a consultant and payment-processor but would no longer shoulder the operating costs.  To this end, the Agreement provides that the Commission

- 3 -

had the option—"at its sole discretion"—to take over the point-of-sale operations from MCA (this provision is referred to as the "POS Option").

The POS Option contemplated a three-stage conversion. The stages are referred to by the parties as the "crawl," "walk," and "run" stages. In the crawl phase, MCA staffed the booths and managed the operations—the parties remained in this stage for the duration of the Agreement. The walk phase would have involved the Commission "taking point of sale operations in house, but using software MCA provided" and MCA "assisting with the training of people" to manage the operations. (Kulick Dep. at 54.) The run phase would have completed the transition for the Commission to handle the operations on its own, licensing and utilizing MCA's payment-processing system, ONSwitch.

MCA maintains the parties repeatedly discussed the Commission's intention to exercise the POS Option during the course of the Agreement. (See e.g., id. at 64.) The Commission acknowledges some discussion of the matter, but maintains it always premised its exercise of the POS Option on MCA settling the Commission's advances on time. On February 17, 2012, the Commission confirmed in writing to MCA that it was planning to exercise the POS Option and move from the "crawl" stage to the "walk" stage "as early as March 1, 2012," without any mention of MCA's late payments. On February 24, the Commission notified MCA booth agents of the upcoming changes, stating it was "working diligently to finalize th[e] transition in the shortest time possible." (McLoughlin Decl. Ex. F.) The parties met on March 8 to discuss labor costs for the conversion. The Commission committed to paying half the costs—almost $1 million—*if*

MCA would adhere to the Vault Cash Settlement Schedule.  (Id. Ex. E.)  MCA did not

agree to this proposal.  (Id.)  But based on the Commission's representations that they

were moving to the next phase, MCA avers it "expended significant resources preparing"

for the conversion, which included "making technological changes, training staff, and

altering its equipment.  (MCA's Mem. in Opp'n at 10; see McLoughlin Decl. Ex. G

(email from MCA's Vice President of Operations stating he was "ordering merchant

ID's, establishing settlement accounts, relay[ing] goals with current MCA employees,

etc. so we can make this transition happen").)

In March 2012, the Commission decided not to go through with the POS

conversion with MCA and instead hired Multi Choice Cash, another bidder, to replace

MCA.  The Commission had found Multi Choice Cash by sending out a Request for

Proposal ("RFP") in late 2011 to potential vendors for bids on a new contract to provide

cash-access services after the Agreement was set to expire that spring.  MCA knew of the

RFP and had submitted a bid in response, but the Commission chose Multi Choice Cash.

On March 28, the Commission took representatives of Multi Choice Cash on a tour of its

casinos to see the operations.  Before the visit, Julie Habeck from the Commission, who

was leading the tour, sent an email instructing the Commission's employees to say that

Multi Choice Cash was "in the middle of a bid and wanted a walk-through of [the]

properties," if anyone at MCA's booths asked what they were doing there during the tour.

MCA alleges, without citing evidence in the record, thatMulti Choice Cash "view[ed]

MCA's operations without its knowledge" and "examine[d] MCA's business procedures

and confidential information" during the tour.  (MCA's Mem. in Opp'n at 13.)  The

Commission denies this.

On April 2, 2012, just a few months before MCA's tenure was set to expire, the

Commission notified MCA it was terminating the Agreement and installing Multi Choice

Cash in its place.  The Commission demanded payment of its outstanding vault cash

advances to MCA—$5,623,690.83 in total—but MCA refused to repay and the balance

remains outstanding.

In July 2012, the Commission filed the instant action, asserting various legal and

equitable claims against MCA, including breach of contract and fraud, primarily seeking

to recover its $5.6 million.  MCA responded by asserting counterclaims against the

Commission seeking to recoup its losses from being "ejected" from the casinos

prematurely and forced to cut operations short in the middle of the (anticipated) POS

conversion.  The Commission now moves for summary judgment on its breach-of-

contract and unjust-enrichment claims and on all of MCA's counterclaims; MCA cross-

moves for partial summary judgment on the Commission's claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557

U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042

(8th Cir. 2011) (en banc).  The Court must view the evidence, and the inferences that may

be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard

v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885,

892 (8th Cir. 2009).  The nonmoving party may not rest on mere allegations or denials,

but must show through the presentation of admissible evidence that specific facts exist

creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v.

SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

Where, as here, the Court confronts cross-motions for summary judgment, this

approach is only slightly modified.  When considering the Commission's Motion, the

Court views the record in the light most favorable to MCA, and when considering

MCA's Motion, the Court views the record in the light most favorable to the

Commission.  "Either way, summary judgment is proper if the record demonstrates that

there is no genuine issue as to any material fact."  Seaworth v. Messerli, Civ. No. 09-

3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x

882 (8th Cir. 2011) (per curiam).

## ANALYSIS

I.   **Choice of Law**

The Agreement contains a choice-of-law clause, which states, "This Agreement

and all rights and obligations herein shall be governed in accordance with applicable laws

of The Mill[e] Lacs Band of Ojibwe, or in the absence of written law thereof the laws of

the federal government . . ., or in the absence thereof, . . . the Laws of the State of

Delaware."  Minnesota generally honors choice-of-law provisions in contracts.[1]  Nw.

Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997).

Accordingly, the Court will apply (in the following order of preference) Mille Lacs Band

law, federal law, or Delaware law to the parties' claims at issue in these Motions.  This

includes the parties' unjust-enrichment, promissory-estoppel, and conversion claims,

because each is closely related to the parties' rights and obligations under the Agreement

and the Court's interpretation thereof.  See id. (under Minnesota law, a contract's choice

of law applies to equitable and tort claims that are "closely related" to the interpretation

of the contract).

## II.     The Commission's Claims

### A.     Breach of Contract

The Commission's contract claim is straight-forward:  MCA promised to repay the

Commission $5.6 million and did not.  Under the Mille Lacs Band Statutes, "[w]hen one

party does not perform a promise pursuant to the terms of the contract, the other party

shall have a breach of contract cause of action."  24 MLBS § 119.[2]  The terms of the

Agreement clearly state MCA "shall" transfer funds to the Commission, after deducting

its fees, in settlement of each of the Commission's advances.  (2d Am. Compl. Ex. A

[hereinafter "Agreement"] § 8.)  MCA acknowledges that, upon termination of the

Agreement, the outstanding balance of the Commission's advances to MCA, minus

---

[1] In a diversity case such as this, the court generally employs the forum state's choice-of-law rules.  See Whitney v. Guys, Inc., 700 F.3d 1118, 1123 (8th Cir. 2012).

[2] The Mille Lacs Band Statutes are available at http://www.millelacsband.com/Page_BandStatutes.aspx.

MCA's fees, was $5,623,690.83.  (Hemming Decl. ¶ 10; Robertson Decl. ¶ 10;

Wolfington Dep. at 114–17; MCA's Answer ¶ 34.)  There is no genuine issue of material

fact with regard to this breach and the Commission is therefore entitled to summary

judgment.

MCA attempts to circumvent summary judgment, asserting the Commission

waived its breach-of-contract claim by habitually accepting late payments from MCA.

But this "defense" misses the mark.  The Commission is moving on MCA's failure to

repay the $5.6 million *altogether*, not its failure to repay it *on time*.  Even assuming—for

the sake of argument—the Commission waived its right to timely repayment of its

advances, there is still no genuine issue as to whether MCA was required to repay the

advances at all.  See Realty Growth Investors v. Council of Unit Owners, 453 A.2d 450,

457 (Del. 1982).

MCA also argues that its counterclaims for breach of contract against the

Commission preclude summary judgment on this claim, contending that the

Commission's own breach excused MCA from performing its obligations under the

Agreement, including the repayment of cash advances.  While it is true that breach by

one party may excuse the other party from performing, e.g., Soderbeck v. Ctr. for

Diagnostic Imaging, Inc., 793 N.W.2d 437, 441 (Minn. Ct. App. 2010),  it is equally true

that the non-breaching party may not stop performance *and* continue to take advantage of

the contract's benefits, e.g., S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d

Cir. 1992).  Even if the Commission had breached the contract, MCA cannot use that

breach as a defense as it is undisputed that MCA continued to take advantage of the

Agreement's benefits by continuing to operate in the Commission's casinos, accept the Commission's advances, and collect its fees.  MCA has offered no evidence to the contrary.

The Commission is entitled to summary judgment on this claim in the amount of $5,623,690.83, plus prejudgment interest at a rate of 10% per year.  See Minn. Stat. § 549.09, subd. 1(c)(2) (awards over $50,000 are entitled to prejudgment interest at a rate of 10% per year); see also Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 918–19 (8th Cir. 2005) (statute applies to diversity cases in federal court); Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd., 845 F. Supp. 2d 975, 979–80 (D. Minn. 2012) (Kyle, J.).[3]

---

[3] In a diversity case such as this, federal courts apply substantive state law and "prejudgment interest is a substantive matter of state law for the purposes of Erie."  Schwan's Sales Enters., Inc. v. SIG Pack, Inc., 476 F.3d 594, 595 (8th Cir. 2007).

> This does not, however, answer the question of *which* state's prejudgment interest law should apply. To determine that issue, we look to the conflict-of-law principles of the state where the district court sits. . . . Because this case arises out of the breach of a contract that contained a choice-of-law provision, we must consider the effect of that provision upon the above analysis. Minnesota courts are committed to the rule that parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made.  This rule is not absolute, however. Even in the face of a general, contractual choice-of-law provision, Minnesota courts apply Minnesota law regarding matters of procedure and remedies. . . . If the parties wish for the application of another state's law concerning such procedural and remedial matters, they must expressly state it in their agreement. The parties did not do so here . . . .

Id. at 596 (quotations and citations omitted).  Under Minnesota law, prejudgment interest is considered procedural, id. at 597, thus Minnesota's prejudgment interest statute applies to the Commission's breach-of-contract claim, notwithstanding the Agreement's choice-of-law provision.

## B.    Unjust Enrichment

In the alternative, the Commission moves for summary judgment on its unjust-enrichment claim.  Having concluded the Commission is entitled to the $5.6 million as compensation for MCA's breach of contract, the Court denies as moot the Commission's Motion as to its alternative claim and grants summary judgment to MCA.

## III.   MCA's Counterclaims

The Commission also moves for summary judgment on all nine of MCA's counterclaims.  MCA asserts six breach-of-contract claims as well as claims for unjust enrichment, promissory estoppel, and conversion.  These counterclaims stem from three categories of factual allegations:  (1) the Commission's termination of the Agreement; (2) the Commission's failure to take over the POS operations; and (3) Multi Choice replacing MCA.  The Court will address each counterclaim in turn.

### A.    Breach of Contract

#### i.  Counts One ("Termination Without Cause") and Six ("Anticipatory Breach")

In two of its claims, MCA alleges the Commission terminated the Agreement without cause.  The Agreement provides that either party may cancel the Agreement for cause, after giving the other party notice of its material breach and 30 days to cure. (Agreement § 28.)  Both parties agree to the following facts:  the parties originally agreed to a Vault Cash Settlement Schedule that allowed MCA up to six days to settle each cash advance; MCA consistently took longer than 6 days to settle the advances; the Commission sent a notice to MCA in October 2011 that it was in breach of the

Agreement for failure to repay advances on time; and the Commission terminated the

Agreement in April 2012 for that reason.

MCA argues the termination was nonetheless unlawful for two reasons.

First, MCA contends it was not in breach of the Agreement because the

Commission waived its right to enforce the Vault Cash Settlement Schedule by habitually

accepting late payments from MCA. The Mille Lacs Band Statutes recognize waiver of

non-performance as a defense to breach of contract. 24 MLBS § 119(b)(4). Waiver may

be either expressly stated or implied from a party's conduct, as MCA alleges here. See

Williston on Contracts § 63:9. Showing "[a]n intent to . . . waive is essential to

establish[ing] a waiver." Id. (emphasis added). This is often a question of fact; "[w]hen,

however, there is no dispute as to the material facts and only one reasonable inference

can be drawn from them, the question of whether a waiver has occurred becomes one of

law." § 39:21. Here, the material facts are not disputed—the parties agree that the

Commission accepted late payments from MCA and expressed its dissatisfaction with

MCA, to the point where MCA knew the payment schedule was a "sore spot" for it.

Because the Commission protested MCA's non-performance, it cannot reasonably be

said to have waived it and MCA cites no law to the contrary.

MCA cites only Rehoboth Mall Limited Partnership v. NPC International Inc., 953

A.2d 702 (Del. 2008), in which the court concluded as a matter of law that the plaintiff

had waived his right to use the defendant's late rent payments as a basis not to renew the

lease agreement. But in Reheboth, the court so held because the plaintiff "accepted late

payments [from the defendant] and allowed [the defendant] to remain in possession of the

leased premises for five years [after the breach] *without objection*." Id. at 705 (emphasis added).  By contrast, the Commission repeatedly objected to MCA's failure to pay on time—the record contains numerous emails and letters expressing its dissatisfaction with MCA.  (Maschka Decl. Exs. D–J, P, & Q.)

The burden to prove waiver rests with MCA, § 39:21, and it "must be clearly established." § 39:14.  Waiver "will *not* be inferred from equivocal acts or language." Id. (emphasis added).  With this high evidentiary burden in mind, the Court cannot conclude that MCA has created a genuine issue that the Commission intended to waive its late payments.

Second, if the Commission did not waive its right to timely payments, MCA argues the Commission's termination was wrongful because MCA was not given notice and an opportunity to cure the breach upon which the Agreement was terminated.  As to this issue, there is no genuine issue of material fact.  The Commission notified MCA that it was not adhering to the agreed upon Vault Cash Settlement Schedule in writing in October 2011, giving MCA the opportunity to cure its breach.  MCA repaid the advances that were outstanding at the time it received that notice within the following thirty days, but it continued to take longer than six days to repay the Commission's subsequent advances during that time.

MCA argues that it "cured" the breach noticed in October 2011 by repaying the settlements that were outstanding at the time of the notice within the following thirty days.  Therefore, it argues, when the Commission terminated the Agreement in April 2012, its termination was based on late or outstanding payments from March 2012, and

- 13 -

because the Commission did not give MCA notice of and opportunity to cure *that* breach, its termination of the Agreement was wrongful.  But MCA misinterprets the nature of the breach noticed and the attendant cure required.  Under MCA's interpretation, the Commission could *never* terminate the Agreement for late payment as long as MCA repaid each settlement outstanding at the time it received a notice of breach within the following thirty days.  This would essentially usurp the agreed upon Vault Cash Settlement Schedule of four to six days and replace it with a de facto repayment schedule of thirty-one days.  The parties could not have intended such an absurd result.  See Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998) (courts should construe contracts so as to avoid absurd results and give meaning to all terms).  After the Commission noticed a breach of the Agreement for failure to repay the advances on time, MCA then had thirty days to cure the breach by bringing its accounts current, but failed to do so; instead, it continued to make late payments and therefore continued to breach the Agreement.  Because MCA has failed to create a genuine issue of fact on whether the Commission unlawfully terminated the Agreement, summary judgment is proper.

### ii.  *Counts Two Through Five*

Counts Two through Five fail because each asserts a breach of contract based on conduct that either does not violate the Agreement or occurred after the Agreement was terminated.  Consequently, MCA has not stated—much less substantiated—a breach-of-contract claim under any of these four counts.

In Count Two, MCA avers the Commission breached the "exclusivity" provision of the Agreement by hiring Multi Choice Cash.  That provision states the Commission "will not . . . grant anyone else the right to provide the services covered under this Agreement on the Gaming Facilities' gaming floor."  (Agreement § 3.)  But there is no allegation that the Commission allowed Multi Choice Cash to provide cash-access services while the Agreement was in effect.  MCA alleges only that the Commission gave Multi Choice Cash a tour of the casino while MCA was operating there, which does not violate any provision of the Agreement, and that it granted Multi Choice Cash the right to provide services *after* the Agreement was terminated, which also does not violate the Agreement because those services were not "covered under [the] Agreement."

In Counts Three, Four, and Five, MCA asserts the Commission breached several provisions of the Agreement by failing to perform after it had terminated the Agreement, ejected MCA from its casinos, and hired Multi Choice Cash.  Specifically, it alleges those actions violated the following provisions:  the "Teller Facilities" provision, which states the Commission "shall provide to MCA a suitable area in the [casinos] . . . from which MCA will provide its services" (id. § 7); the "Hours of Operation" provision, which states MCA would provide services at the casinos 24 hours a day, 7 days a week, unless otherwise agreed in writing (id. § 15); and the POS Option (id. § 10).  None of these alleged actions constitutes a breach of contract because none took place while the Agreement was in effect.

**B.**     **Unjust Enrichment and Promissory Estoppel**

MCA also asserts counterclaims of unjust enrichment and promissory estoppel,

seeking to recoup the damages it suffered as a result of the Commission (allegedly)

exercising the POS Option and later reneging and terminating the Agreement.

Equitable claims, such as unjust enrichment and promissory estoppel, do not apply

where a valid, enforceable contract governs the promise at issue.  See Siga Techs., Inc. v.

Pharmathene, Inc., 67 A.3d 330, 348 (Del. 2013).  "[I]f a contract covers the subject

matter, the defendant's conduct either violates the contract or not.  If the defendant did

not violate the contract governing the subject of the dispute, then the plaintiff cannot

attempt to hold the defendant responsible by softer doctrines, and thereby obtain a better

bargain than he got during the contract negotiations."  Ameristar Casinos, Inc. v. Resorts

Int'l Holdings, LLC, No. CIV. A. 3685-VCS, 2010 WL 1875631, at *13 (Del. Ch. May

11, 2010).  That is what MCA seeks to do here.  The POS Option is a term of the parties'

Agreement—the enforceability of which is not disputed—and therefore MCA may not

attempt to hold the Commission liable through unjust enrichment or promissory estoppel.

Accordingly, the Commission is entitled to summary judgment on these claims.   See also

Siga Techs., 67 A.3d at 348 ("Promissory estoppel does not apply . . . where a fully

integrated, enforceable contract governs the promise at issue."); Bakerman v. Sidney

Frank Import. Co., No. Civ.A. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10,

2006) ("Courts developed unjust enrichment as a theory of recovery to remedy the

absence of a formal contract.  Therefore, claims of unjust enrichment may survive a

motion to dismiss when the validity of the contract is in doubt or uncertain.  When the

- 16 -

complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed.") (footnotes omitted).

### C.    Conversion

MCA's final counterclaim is for the intentional interference with personal property (referred to here as "conversion") under 24 MLBS § 225.[4]  MCA alleges the Commission intentionally interfered with its contracts with its booth agents by ejecting it from the casinos and "convert[ing] [its] booth agents into Multi Choice [Cash] employees." (Answer & Counterclaims ¶ 130.)  In its Memorandum, MCA asserts the Commission acted "surreptitiously" to "convert" MCA employees into Multi Choice Cash employees and that it "assist[ed] Multi Choice Cash with hiring those same employees."  (MCA's Mem. in Opp'n at 37.)  But it does not give any factual explanation (much less evidence) of how, specifically, it believes the Commission did so.

Mille Lacs Band law provides:

A trespass to a personal property may be committed by intentionally and unlawfully:
(1) Dispossessing another of the personal property; or
(2) Using or interfering with the use of personal property in the possession of another, where:
    (A) the personal property is impaired as to its condition, quality or value; or
    (B) the possessor is deprived of the use of the personal property for a substantial time; or
    (C) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.
(3) Disposing of personal property entrusted to the person.
(4) Mis-delivering personal property.

---

[4] MCA refers to its claim as a claim for "tortious interference with contractual relations," but Mille Lacs Band law does not recognize such a claim.  Further, MCA pleaded the claim under the Mille Lacs Band conversion statute, so the Court analyzes it accordingly.

(5) Refusing to surrender personal property to the person entitled thereto.

24 MLBS § 225.

Assuming without deciding that MCA's contracts with its employees constitute "personal property" within the meaning of the statute, MCA's claim nonetheless fails because it has offered no evidence that the Commission used, interfered with MCA's use of, dispossessed MCA of, disposed of, misdelivered, or refused to surrender those contracts.[5]  Nowhere in its Memorandum does MCA refer to any evidence indicating the Commission even had access to the contracts.   Instead, it baldly asserts that the Commission "acted willfully and without justification to interfere with MCA's contracts with its booth agents and assist Multi Choice Cash with hiring those same employees." (MCA's Mem. in Opp'n at 37.)  The Court seriously doubts whether this assertion—if true—would constitute conversion, but it need not decide the issue because MCA has not

---

[5] The Commission also objects to the adjudication of this counterclaim on the grounds of sovereign immunity, which the Court must address first.  Indian tribes have sovereign immunity from suit "absent a clear waiver by the tribe or congressional abrogation." Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509, 511 (1991).  Mille Lacs Band law extends the Mille Lacs Band's sovereign immunity to the Commission.  16 MLBS § 101.  But when a tribe commences a lawsuit, "it waives immunity as to claims of the defendant which assert matters in recoupment—arising out of the same transaction or occurrence which is the subject matter of the [plaintiff]'s suit.  The counterclaims of the defendant must seek relief of a similar nature to that sought by the plaintiff and in an amount not in excess of the plaintiff's claim." Rosebud Sioux Tribe v. A&P Steel Inc., 874 F.2d 550, 552–53 (8th Cir. 1989) (quotation and citations omitted).

The Commission argues that sovereign immunity bars MCA's counterclaims that involve Multi Choice Cash because its claims do not.  While that may be true, the test does not require that MCA's counterclaims be mirror images of the Commission's—it simply requires that they arise out of the same transaction.  The Commission's claims arise out of the parties' Agreement and so do MCA's, notwithstanding the fact that MCA may focus on different aspects of the Agreement and the parties' conduct thereunder.  Furthermore, each counterclaim "seeks similar monetary relief" to the Commission's claims and "is for an amount less than that sought" by the Commission. Id. at 553.  Therefore, the Commission has waived its sovereign immunity as to each of MCA's counterclaims, including conversion.

presented a single shred of evidence to support it.  Because there is no genuine issue of fact, the Court will grant summary judgment.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that the Commission's Motion for Partial Summary Judgment (Doc. No. 167) is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)      The Motion is **GRANTED** as to Count I of the Second Amended Complaint (Doc. No. 129) *against MCA only*;[6]

(2)      The Motion is **GRANTED** and as to all Counts of MCA's Answer and Counterclaims (Doc. No. 151), and those claims are **DISMISSED WITH PREJUDICE**.

(2)      In all other respects, the Motion is **DENIED**.

**IT IS FURTHER ORDERED** that MCA's Motion for Summary Judgment on Plaintiff's Breach of Contract Claims (Doc. No. 171) is **GRANTED IN PART** and **DENIED IN PART**.  That Motion is **GRANTED** as to Count II of the Second Amended Complaint (Doc. No. 129), and that claim is **DISMISSED WITH PREJUDICE** *against MCA only*.  In all other respects, the Motion is **DENIED**.

Dated:  September 30, 2013

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[6] This refers to both Defendants Money Centers of America, Inc. and MCA of Wisconsin, Inc.