## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Corporate Commission of the Mille
Lacs Band of Ojibwe Indians,

|  |  |
|---|---|
| Plaintiff, | Civ. No. 12-1015 (RHK/LIB) |
| | **MEMORANDUM OPINION** |
| | **AND ORDER** |

v.

Money Centers of America, Inc., et al.,

Defendants.

Jane E. Maschka, Michael M. Krauss, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Plaintiff.

Erin M. Carter, Luke P. McLoughlin, James L. Beausoleil, Jr., Duane Morris LLP, Philadelphia, Pennsylvania, Robert B. Patterson, Jr., Patterson Law Office, PA, Minnetonka, Minnesota, for Defendants.

## INTRODUCTION

Plaintiff Corporate Commission of the Mille Lacs Band of Ojibwe Indians ("the Commission") retained Defendants Money Centers of America, Inc. and MCA of Wisconsin, Inc. (collectively "MCA") to perform cash-access services for the Commission in its casinos. As part of their agreement, the Commission advanced MCA cash from its casino vaults for MCA's transactions with casino patrons. MCA would then deduct its fees from the amounts it received from patrons and transfer the balance back to the Commission. Over the course of the parties' three-year relationship, MCA fell behind on its payments to the Commission, causing the Commission to ultimately

terminate their agreement and initiate this action against MCA and Defendants Mark and

Christopher Wolfington ("the Wolfingtons"), two of MCA's corporate officers who the

Commission alleges were pocketing the money advanced instead of paying it back.

MCA now moves to dismiss five of the Commission's claims against it and the

Wolfingtons move to dismiss all claims against them.  For the reasons set forth below,

MCA's Motion will be denied and the Wolfingtons' Motion will be denied in part and

granted in part.

## BACKGROUND

The following facts are alleged by the Commission in its Second Amended

Complaint.

### The Parties' Agreement and Cash Advance Schedule

On April 17, 2009, the Commission and MCA entered into a three-year contract

("the Agreement") for MCA to provide cash-access services at the Commission's

casinos.  (2d Am. Compl. ¶¶ 18–19.)  The Agreement provided that the Commission

would advance MCA cash from its on-site vaults so MCA could provide "check cashing,

credit/debit card advances and other cash access services" to casino guests.  (Agreement

§ 8.)  Under the Agreement, MCA was to return the money to the Commission by

electronic transfer "in accordance with the Vault Cash Settlement Schedule to be

provided by MCA" to the Commission "prior to the first advance."  (Id.)  The parties

agree that they established a Vault Cash Settlement Schedule allowing MCA four to six

days to settle each advance.  (See 2d Am. Compl. Ex. B.)

During the course of their relationship, the Commission advanced money to MCA nearly every day.  (Id. ¶ 25.)  The amount of each advance varied, as it was based on MCA's estimate of how much cash it needed for the day.  (Id.)  "The Agreement and Vault [Cash] Settlement Schedule necessarily resulted in MCA 'holding' a certain amount of the Commission's Vault Cash on any given day."  (Id. ¶ 28.)

Soon after MCA began operating in the casinos, it was "breaching its promise to return the Vault Cash within six (6) days."  (Id. ¶ 29.)  The delays in repayment caused the total amount of money MCA owed to the Commission on any given day to increase over time.  The Commission discussed the delays with MCA on several occasions, to no avail. (E.g., id. Exs. C & D.)  On October 13, 2011, the Commission sent MCA a notice of breach informing it of its failure to comply with the Vault Cash Settlement Schedule and allowing it thirty days to cure the breach before termination, as provided for in the Agreement.  (Id. ¶ 39.)  Notwithstanding this notice, MCA continued to delay its return of the Commission's advances.  (Id.)  On April 2, 2012, the Commission terminated the Agreement and demanded return of the outstanding vault cash advances totaling $5,623,690.83.  (Id. ¶ 40 & Ex. G.)  To date, MCA has not returned this money to the Commission.  (Id. ¶ 41.)

**MCA's Alleged Fraudulent Statements**

The Commission alleges MCA made multiple misrepresentations during the course of their relationship.  Only two of the allegations are relevant to the instant Motion: (1) MCA misrepresented its financial status when bidding on the Commission's

contract by indicating it was not in default on any of its loans and (2) MCA falsely represented that its delay in repaying funds was due to labor costs.

In December 2006, Baena Advisors, LLC ("Baena") loaned MCA $4.75 million. Pursuant to the terms of the loan, MCA had to maintain a borrowing base of at least $5.5 million.  (Id. ¶ 78.)  The Commission alleges that MCA defaulted on this loan provision just three days after receiving the loan and has remained in default since.  (Id.)  As a result, all cash held by MCA was restricted and controlled by Baena.  (Id. ¶ 79.)  In March 2007, MCA, with permission of Baena, submitted a bid to the Commission to provide cash-access services in its casinos.  In that bid, MCA indicated "No" in response to the question, "Is [MCA] currently in default on any loan or financing agreement with any bank, financial institution, or other entity?"  (Id. ¶ 83.)  The Commission alleges this answer was false (because MCA had defaulted on the Baena loan) and that it relied on this misrepresentation in awarding the contract to MCA.  (Id.)

The Commission also alleges that MCA made false statements regarding the cause of its delay in returning funds.  MCA represented that the delay was because the funds were tied up as "additional working capital" needed to satisfy labor costs.  For example, on February 16, 2011, Mark Wolfington, MCA's Chief Operating Officer, wrote to the Commission, proposing the Commission increase the fees it paid MCA in an effort to ameliorate MCA's settlement delays:

> [MCA] did not adequately incorporate the sizable labor costs and ongoing risk premium into the original contract.  As a result, MCA has to fund the additional working capital needed by the Mille Lacs operation. . . . By achieving the proper market proving for a full check cashing booth operation, MCA can work quickly to ameliorate the current settlement

issues . . . .   The [proposed] rate adjustment will free up working capital and reduce settlement to 5 days.

(<u>Id.</u> Ex. D.)  The Commission alleges that these statements were untrue—its fees *were* sufficient to cover its operating costs—and that MCA made the statements in an effort "to conceal the fact that the Wolfington Family had fraudulently transferred the money out of MCA."  (<u>Id.</u> ¶ 97.)  The Commission asserts it relied on these misrepresentations in continuing to advance MCA vault cash instead of terminating the Agreement.  (<u>Id.</u> ¶ 133.)

### The Wolfingtons

In April 2012, after MCA refused to repay the outstanding advances, the Commission initiated this action against it.  During discovery, the Commission learned that MCA is insolvent and has been since 2006 (<u>id.</u> ¶ 53a), and that very little of the $5.6 million it had advanced MCA was left in MCA's accounts (<u>see</u> Doc. Nos. 87, 110).  In January 2013, the Commission amended its Complaint to add the Wolfingtons as Defendants.  Christopher Wolfington is MCA's Chief Executive Officer, dominant shareholder, and one of MCA's two board members (along with his brother-in-law Jonathon Ziegler).  (<u>Id.</u> ¶¶ 11, 53(c).)  Mark Wolfington is Christopher Wolfington's cousin and MCA's Chief Operating Officer.  (<u>Id.</u> ¶ 12.)  In its Second Amended Complaint, the Commission seeks to hold the Wolfingtons responsible for MCA's actions, alleging MCA is merely their alter ego and they use MCA "to take money belonging to casinos associated with Native American tribes to fund their lifestyles."  (2d Am. Compl. ¶ 1.)

The Commission avers the Wolfingtons used its advances to MCA for personal expenditures with no intention of repaying it.  In support of its contention, the Commission details the following transactions:  more than $1 million in cash withdrawals in June 2009; hundreds of thousands paid toward Christopher Wolfington's credit card in January and February 2010; wires of $1,000 a month to pay off a personal line of credit held by Christopher Wolfington; $83,000 in advances to Mark Wolfington to pay his personal taxes in June 2012 among other expenses; a $15,000 wire to Christopher Wolfington's brother-in-law, who does not provide services to MCA, in June 2012; more than $70,000 in transfers to an LLC of which Christopher Wolfington is the sole member; payments for a Mercedes Benz and Jaguar for Christopher Wolfington and the cell phones of the Wolfingtons; and numerous payments to entities such as Netflix, iTunes, Kindle Book, and Amazon.com.  (Id. ¶ 53e.)

The Commission also avers the Wolfingtons and MCA intentionally misrepresented the cause of the delay in repayment—claiming their fees were not enough to pay their labor costs—in order to cover up their own misuse of the funds and "in an attempt to get even more money from the Commission."  The Commission alleges this is the Wolfingtons' "scheme" and that it has done the same to other Native American tribes—seeking out their business, taking their cash, siphoning off funds for their personal use, delaying repayment, and misrepresenting how they are using the cash advances in order to prolong the relationship.  (See id. ¶ 67.)

**The Instant Action**

After terminating the Agreement in April 2012 and commencing this action against MCA, the Commission amended its Complaint (for the first time) in August 2012. MCA moved to dismiss certain of its claims and the Court heard that Motion in October 2012. In late December 2012, the Commission moved for a preliminary injunction and attachment, which the Court denied. In January 2013, the Commission amended its Complaint for a second time, adding several claims and joining additional Defendants. The Commission since has voluntarily dismissed several of the newly added Defendants and only MCA and Mark and Christopher Wolfington remain.[1] MCA and the Commission then cross-moved for summary judgment; the Court granted summary judgment to the Commission on its breach-of-contract claim and all of MCA's counterclaims and granted MCA summary judgment on the Commission's unjust-enrichment claim. Currently, the Commission has ten claims pending against four Defendants (Money Centers of America, Inc., MCA of Wisconsin, Inc., Mark Wolfington, and Christopher Wolfington). MCA now moves to dismiss five of the Commission's claims against it: conversion (Count III), replevin (Count IV), constructive trust (Count V), and fraud (in part) (Count VI). And the Wolfingtons jointly move to dismiss all of the claims against them: piercing the corporate veil/breach of contract (Count I), unjust enrichment (Count II), conversion (Count III), constructive trust (Count V), fraud (Count VI), fraudulent transfers (Counts IX, X, XI), and breach of

---

[1] The Commission also joined Sean Wolfington, Jonathon Ziegler, Baena Advisors, LLC, and Real Estate Empowered, LLC, but has since voluntarily dismissed them without prejudice. (See Doc. No. 177.)

fiduciary duty (Count XIV).  The Motions have been fully briefed and are now ripe for disposition.

## STANDARD OF DECISION

The Supreme Court set forth the standard for evaluating a motion to dismiss in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  To avoid dismissal, a complaint must include "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 547.  A "formulaic recitation of the elements of a cause of action" will not suffice.  Id. at 555.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).

When reviewing a motion to dismiss, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions."  Brown v. Medtronic, Inc., 628 F.3d 451, 459 (8th Cir. 2010) (citing Twombly, 550 U.S. at 556).  The complaint must be construed liberally, and any allegations or reasonable inferences arising therefrom must be interpreted in the light most favorable to the plaintiff.  Twombly, 550 U.S. at 554–56.  A complaint should not be dismissed simply because the Court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations.  Id. at 556.  Accordingly, a well-pleaded complaint will survive a motion to dismiss even if it appears that recovery is very remote and unlikely.  Id.  "Finally, the complaint should be read as a whole, not parsed piece by

piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009).

## ANALYSIS

### I.  MCA's Motion to Dismiss

#### A.  Rule 12(g)

The Commission objects to MCA's Motion under Federal Rule of Civil Procedure 12(g), which states, "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." The Commission asserts this rule precludes MCA from making any argument in this Motion that was available to it in its first Motion to Dismiss (decided in October 2012). Because the Commission did not alter Counts Two through Five when it amended its Complaint in January 2013, it asserts that MCA's Motion is barred as it relates to those Counts. But the Commission overlooks an exception: "Failure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(1); (B) by a motion under Rule 12(c); or (C) at trial." Fed. R. Civ. P. 12(h)(2). Courts have interpreted this rule to mean that the failure to state a claim is not a waivable defense, *un*like other defenses under Rule 12 such as improper service or lack of personal jurisdiction. E.g., Ennenga v. Starns, 677 F.3d 766, 773 (7th Cir. 2012) ("Rule 12(h)(2) specifically excepts failure-to-state-a-claim defenses from the Rule 12(g) consolidation requirement."). Because Rule 12(h)(2) allows a party to raise the defense at trial, "there is no reason why [the court] should not hear it now, together with [the] [d]efendants'

other dismissal arguments." <u>Burtch v. Opus, L.L.C. (In re Opus East, L.L.C.)</u>, 480 B.R.

561, 569 (Bankr. D. Del. 2012); <u>accord, e.g.</u>, <u>Hayes v. Invigorate Int'l, Inc.</u>, No. 04-1577,

2004 U.S. Dist. LEXIS 20180, at *7 (E.D. Pa. Sept. 24, 2004).  Accordingly, the Court

will consider MCA's Motion in its entirety.

### B.       Conversion, Replevin, and Constructive Trust

The Commission asserts claims for conversion, replevin, and constructive trust

seeking to recover "Vault Cash" that was "wrongly taken" by MCA.  MCA moves to

dismiss all three claims, asserting it is "undisputed" it does not possess vault cash,

because it provided all the vault cash it received to casino patrons as directed by the

Agreement.  (MCA's Mem. in Supp. at 12.)  In support of this assertion, MCA cites the

Court's Order denying the Commission's Motion for Preliminary Injunction.  In that

Motion, the Commission sought to attach or freeze certain of MCA's bank accounts,

claiming the money in those accounts "belonged to" the Commission.  In its Order

denying the Motion, the Court stated "the money [the Commission] seeks is not 'its own'

because the Commission's vault cash was distributed to casino customers, not retained by

MCA."  (Doc. No. 112 at 10.)  MCA latches on to this language, claiming "[i]t is now

confirmed that MCA did not defraud or dispossess the Commission of any Vault Cash."

(MCA's Mem. in Supp. at 11.)  Despite MCA's assertions to the contrary, that fact is

neither "undisputed" nor "confirmed."  In its Motion for Preliminary Injunction, the

Commission bore the burden of proving its allegations to the Court and it did not present

any evidence of MCA receiving or using vault cash in an unlawful manner.  In this

Motion, by contrast, the Commission bears no burden of proof and the Court must take

the Commission's allegations that MCA did so as true.  See also Henderson v. Bodine

Aluminum, Inc., 70 F.3d 958, 962 (8th Cir. 1995) ("[T]he general rule [is] that 'the

findings of fact and conclusions of law made by a court granting a preliminary injunction

are not binding at trial on the merits.'") (quoting Univ. of Tex. v. Camenisch, 451 U.S.

390, 395 (1981)).

More importantly, the Commission has since filed a Second Amended Complaint,

which includes new allegations that MCA and its owners misappropriated funds received

from the Commission.  It alleges that MCA's owners used the cash from the

Commission's vaults "as a line of credit to fund their lifestyles."  (2d Am. Compl. ¶ 52.)

It further alleges that MCA has disposed of the vault cash and refused the Commission's

demands that MCA return the cash.  These allegations are sufficient to state a claim for

intentional interference with personal property under the Mille Lacs Band Statutes, which

prohibit intentionally and unlawfully "disposing of personal property entrusted to the

person" and "refusing to surrender personal property to the person entitled thereto."  24

MLBS § 255.  For the same reasons, the Commission has properly pleaded replevin, an

action to "recover the possession of personal property wrongfully taken," Minn. Stat.

542.06, and a request for declaratory judgment in the form of a constructive trust.  MCA

may not defeat the Commission's allegations at this stage by simply denying them.

###   C.   Fraud

The Commission asserts a claim for fraud against MCA, citing several alleged

misrepresentations.  In this Motion, MCA challenges two of them—that MCA

misrepresented its financial status in 2007 and the reason for its delayed repayments in

2010 and 2011.  Under Mille Lacs Band law, [2] to state a claim for fraud, the Commission must allege that MCA intentionally made a false representation with the intent to deceive the Commission and for the purpose of inducing the Commission to rely upon it, and that the Commission did rely upon the misrepresentation and suffered some injury or damage as a result.  24 MLBS § 402.  MCA challenges the first alleged misrepresentation, regarding the Baena loan, on the grounds that (1) MCA's statement was not false and (2) the Commission was not entitled to rely on the statement.  And it challenges both alleged misrepresentations for lack of injury or detrimental reliance.

MCA first asserts that its statement in the 2007 bid was not false because it was not in default on the Baena loan.  In support, it cites public filings with the Securities and Exchange Commission indicating Baena waived MCA's default in August 2008.  (See MCA's Mem. in Supp. at 15; MCA's Nov. 21, 2008 10-Q at 10.)  But that waiver was only "retroactive to January 1, 2008" and the Commission alleges MCA submitted its bid in March 2007.  Thus, MCA's first argument is unavailing.

MCA next asserts the Commission cannot claim it reasonably relied on this statement in light of the Agreement's integration clause.  That clause states, "This Agreement constitutes the entire understanding and agreement between the parties and

---

[2] The parties' Agreement contains a choice-of-law clause, which states, "This Agreement and all rights and obligations herein shall be governed in accordance with applicable laws of The Mill[e] Lacs Band of Ojibwe, or in the absence of written law thereof the laws of the federal government . . ., or in the absence thereof, . . . the Laws of the State of Delaware."  Minnesota generally honors choice-of-law provisions in contracts.  Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997).  Accordingly, the Court will apply (in the following order of preference) Mille Lacs Band law, federal law, or Delaware law to the parties' claims arising from or relating to the parties' rights and obligations under the Agreement.  As to all other claims, the Court need not analyze which state's law applies—Delaware's or Minnesota's—because the choice does not affect the outcome of this Motion.

supersedes any and all prior negotiation, correspondence and undertakings between the parties with respect to the subject matter herein." The parties disagree about the validity and effect of this clause.

The Commission argues the integration clause is void under a Mille Lacs Band Statute prohibiting "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another." 24 MLBS § 116. The Court is not persuaded by this interpretation. First, that statute voids entire "contracts" not contract provisions. Second, even if the integration clause did preclude the Commission's fraud claim based on pre-contractual statements, the "object" of the Agreement would still not be to exempt MCA from fraud, it would be an incidental effect at most.

MCA asserts the clause "disclaims" all prior representations by MCA and prohibits the Commission's reliance thereon, thus precluding a fraud claim. [3] But this interpretation is overreaching. While an integration clause may preclude a party from seeking to enforce a promise not contained in the agreement, it does not ordinarily preclude claims of fraud. See 37 Am. Jur. 2d Fraud & Deceit § 315 ("[G]enerally, a merger clause is not an impediment to a cause of action for fraud in the inducement. . . . It is elementary that where a contract or transaction was induced by false representations, the representations and the contract are distinct and separable—that is, the representations

---

[3] MCA also alleges the Mille Lacs Band's parol evidence rule precludes the Court's consideration of these statements, but it only raised this argument in its Reply brief. As the Commission has not had an opportunity to respond to this argument, the Court will not consider it. See Berbig v. Sears Robuck and Co., 568 F. Supp. 2d 1033, 1039 n.10 (D. Minn. 2008) (Kyle, J.) (generally the court does not consider arguments raised for the first time in a reply).

- 13 -

are usually not regarded as merged in the contract or deed.") (footnotes omitted);
Restatement (Second) of Contracts § 214 cmt. c ("What appears to be a complete and
binding integrated agreement . . . may be voidable for fraud . . . .  Such invalidating
causes . . . are not affected even by a 'merger' clause.").  One exception is integration
clauses that specifically mention and disclaim the parties' "reliance" on prior statements.
37 Am. Jur. 2d Fraud & Deceit § 316 ("Although fraud in the inducement is separable
from the terms and conditions of a contract, and ordinarily would not preclude an action
for fraud based on false inducement, where the contract specifically disclaims reliance
upon any representations not set forth in the contract . . . a claim in fraud . . . may be
barred.") (footnotes omitted).   Because the parties did not specifically disclaim their
reliance upon prior representations, the Court concludes their integration clause does not
bar the Commission's fraud claim.

Finally, MCA argues that, even if the Commission did rely on the alleged
misrepresentations, it suffered no injury or damage as a result.  But the Commission has
alleged that, but for MCA's statement in its 2007 bid, the Commission would not have
entered into the Agreement, and thus would not have lost $5.6 million to MCA as a
result.  It also alleges that, but for MCA's statements regarding the cause for its
settlement delays, it would not have continued advancing cash to MCA and would have
cut its losses a year or so earlier, when MCA owed it less money.  These allegations of
causation and injury are sufficient to state a claim for fraud for both the 2007 and
2010/2011 alleged misrepresentations.

## II.      Mark and Christopher Wolfington's Motion to Dissmiss

### A.      Breach of Contract and Piercing the Corporate Veil

The Commission seeks to pierce MCA's corporate veil and hold the Wolfingtons

responsible for MCA's breach of contract and other alleged unlawful activity.  Delaware

law permits a plaintiff to pierce the corporate veil and hold individual owners liable when

a corporation is the mere instrumentality of the owner.[4]  NetJets Aviation, Inc. v. LHC

Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir. 2008).  A corporation is the mere

instrumentality or alter ego of its owner when (1) the corporation and individual operated

as a "single economic entity" and (2) the individual used the corporate form to perpetrate

fraud or similar injustice.  Id. at 177.  The Commission has pleaded facts supporting both

these elements and, consequently, its claim for breach of contract against the

Wolfingtons.

First, the Commission has alleged several factors indicating MCA and the

Wolfingtons operated as a single economic entity.   Courts consider a corporation's

undercapitalization, the failure to observe corporate formalities, the absence of corporate

records, the nonpayment of dividends, the insolvency of the corporation at the time of the

transaction, the siphoning of corporate funds by the dominant stockholder, and other

factors as evidence that the corporation and its owner operated as a single economic

entity.  "While the list of factors is not exhaustive and no single factor is dispositive,

---

[4] Delaware law applies to the Commission's claim for breach of fiduciary duty because it relates to the internal affairs of MCA, which was incorporated in Delaware.  See Potter v. Pohlad, 560 N.W.2d 389, 391 (Minn. Ct. App. 1997) ("The fiduciary duties of a corporation's officers and directors are generally governed by the law of the state of incorporation.").

some combination []is required."  Blair v. Infineon Techs. AG, 720 F. Supp. 2d 462,

470–71 (D. Del. 2010).  The Commission has alleged more than "some combination" of

these factors—it has alleged facts supporting *all* of them.  The Commission alleges MCA

has been insolvent since 2006 and continues to operate while losing money; it does not

pay dividends; it does not keep minutes of board meetings or records of loans to the

Wolfingtons; it has only two board members, Christopher Wolfington and his brother-in-

law; and the Wolfingtons use corporate funds to pay personal lines of credit, family

members, personal taxes, and more.  (2d Am. Compl. ¶¶ 53, 95, 98.)

The Commission also has pleaded sufficient facts in support of the second

element—fraud or injustice.  It alleges the Wolfingtons, through MCA, entered into the

Agreement with the Commission for the purpose of gaining access to the casinos' cash,

knowing that MCA would not and could not repay the money as promised.  (Id. ¶¶ 41,

54, 64–65.)  The Commission further alleges that the Wolfingtons engaged in similar

transactions with other Native American tribes for the same fraudulent purpose of gaining

access to a short-term cash flow with which to fund their extravagant lifestyles.  (Id. ¶¶ 4,

67.)  In the Court's view, the use of the corporate form to gain access to and

misappropriate other companies' funds, if true, would certainly be unjust, if not

fraudulent.

In their Memorandum, the Wolfingtons deny many of the Commission's

allegations and assert "the documents the Commission received in discovery belie the

Commission's own allegations" that MCA is a mere instrumentality (Wolfingtons' Mem.

in Supp. at 20); but the Court cannot consider such outside evidence on a motion to

dismiss and must instead accept the Commission's allegations as true.  Accordingly, the

Court concludes the Commission has alleged adequate facts to support piercing the

corporate veil and thus may maintain its breach-of-contract claim against the

Wolfingtons.  See U.S. v. Golden Acres, 702 F. Supp. 1097, 1106 (D. Del. 1988) ("Even

more significant to the alter ego analysis is the reason why Golden Acres was insolvent

and incapable of paying dividends: defendants were siphoning funds out of the

corporation at regular intervals. . . . [D]efendants effectively used the corporation as an

'incorporated pocketbook.'  Any cash infusions into the corporations were by short-term

loan only."); NetJets, 537 F.3d 168, 182 (summary judgment inappropriate on piercing

the corporate veil where evidence would permit a reasonable factfinder to conclude the

defendant "treated [the company's] bank account as one of his pockets, into which he

reached when he needed or desired funds for his personal use" and his payments "were

deliberately mischaracterized as loans in order to mask the fact that [the defendant] was

making withdrawals from [the company] that were forbidden by law"); TradeWinds

Airlines, Inc. v. Soros, Nos. 08 Civ. 5901(JFK) & 10 Civ. 8175(JFK), 2012 WL 983575,

at *7 (S.D.N.Y. Mar. 22, 2012) (applying Delaware law, court held plaintiff had "clearly"

stated a claim for piercing the corporate veil where defendants siphoned funds and left

company undercapitalized).

## B.    Fraud, Conversion, and Constructive Trust

Having determined that the Commission has stated claims for fraud, conversion,

and constructive trust against MCA, and having determined that the Commission may

seek to pierce the corporate veil and hold the Wolfingtons accountable for MCA's

alleged wrongdoing, it follows then that the Commission has stated these claims against the Wolfingtons as well.

### C.    Unjust Enrichment

This Court has granted summary judgment in favor of MCA on the Commission's unjust-enrichment claim (see Doc. No. 239) and the Commission has not pleaded any facts that would support a finding of unjust enrichment against the Wolfingtons in their individual capacities, separate from or independent of MCA.  Therefore the Court will dismiss the Commission's unjust-enrichment claim against the Wolfingtons.

### D.    Fraudulent Transfers

The Commission alleges multiple of MCA's transfers to the Wolfingtons were fraudulent and unlawful.  It asserts three claims under Delaware law, seeking to avoid those transfers:  fraudulent transfer with actual intent (Count IX), fraudulent transfer with constructive intent (Count X), and preference (Count XI).

### i. Fraudulent Transfer

Under Del. Code Ann. tit. 6 § 1304(a)(1), "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor." To determine whether a transfer was made with actual intent to defraud, a court considers whether the following "badges of fraud," among others, were present:  the transfer was to an insider; the transfer was concealed; before the transfer was made, the debtor had been sued or threatened with suit; the debtor removed or concealed assets; and the debtor was insolvent shortly after the transfer was made.  § 1304(b)(1).  The Commission alleges

facts implicating each of these badges.  It alleges MCA made transfers to the

Wolfingtons, who are corporate insiders, that MCA concealed these transfers by giving

the Commission false reasons for its delayed settlements, that the transfers were made

while another Native American tribe had a lawsuit pending against MCA, and that MCA

was insolvent at the time of the transfers.  (2d Am. Compl. ¶¶ 153–61.)  Accordingly, the

Commission has pleaded sufficient facts to support an actual intent to defraud.

If actual intent cannot be proved by a creditor, a debtor's transfer to an entity may

nonetheless be proved fraudulent if the debtor did not receive reasonably equivalent value

in exchange and was engaged in, or about to engage in, business for which its remaining

assets were unreasonably small.  § 1304(a)(2).  The Commission alleges each of these

requirements.  It alleges MCA's transfers to the Wolfingtons were in addition to the

Wolfingtons' salaries and bonuses, and thus not in exchange for their services, so MCA

did not receive reasonably equivalent (or any) value for them.  It also alleges that MCA

was insolvent at the time of the transfers, and thus MCA's assets were unreasonably

small for its business.  Accordingly, the Commission has pleaded sufficient facts in

support of a constructive intent to defraud.

The Wolfingtons argue the Commission did not plead the allegedly fraudulent

transfers with specificity, as required by Federal Rule of Civil Procedure 9(b).  But the

Commission provided dates, amounts, and the parties involved for each of the transfers

alleged.  (See 2d Am. Compl. ¶¶ 53, 62.)  The Wolfingtons also assert that each transfer

had a legitimate business explanation, which it has provided to the Commission during

discovery.  But as the Wolfingtons are moving to dismiss—not for summary judgment—the Court accepts the Commission's allegations as true.

ii. *Preference*

The parties disagree about which state's law applies to the Commission's preference claim.  The Commission cites Delaware law, but the Wolfingtons argue for Pennsylvania law.  The Court need only engage in a choice-of-law analysis if it will affect the outcome of the Motion.  For example, Pennsylvania and Delaware law both recognize claims for fraudulent transfers with actual or constructive intent as set forth by the Uniform Fraudulent Transfers Act, thus the Court may apply either state's law to those claims and reach the same result.  But only Delaware law recognizes preference claims, Pennsylvania law does not.  As this difference is dispositive, the Court must choose which state's law to apply.

When faced with a conflict of laws, the Court applies Minnesota's choice-of-law rules.  The Commission advocates for the application of Delaware law by way of the "internal affairs doctrine," which provides that the law of the state of incorporation—in MCA's case, Delaware—normally determines issues relating to the internal affairs of the corporation.  See e.g., Potter v. Pohlad, 560 N.W.2d 389, 391 (Minn. Ct. App. 1997).  The Wolfingtons, on the other hand, ask the Court to apply Minnesota's standard five-factor choice-of-law analysis, which they assert would result in the application of Pennsylvania law because that is where MCA is headquartered and where they reside.  The theory behind the internal affairs doctrine is that "only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships

among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." <u>Edgar v. MITE Corp.</u>, 457 U.S. 624, 645 (1982).  Although the preference claim is between a third party, the Commission, and MCA, it relates to transfers between MCA and its officers (and directors and shareholders, in the case of Christopher Wolfington).  The Restatement (Second) of Conflict of Laws instructs that "internal affairs" may include "[m]atters which may also affect the interests of the corporation's creditors" such as "loans by the corporation to directors, officers and shareholders."  § 302.  Although the preference claim is between MCA and the Commission, its subject is a series of transfers between MCA and its officers (or, in the case of Christopher Wolfington, its officer, director, and shareholder).  Given the internal nature of the transactions at issue in this claim, Minnesota's internal affairs doctrine (and thus Delaware law) should apply.

Delaware law permits preference claims, which allow creditors to challenge payments made to insider creditors who knew the debtor was insolvent.  Del. Code. Ann. tit. 6 § 1305(b).  The Commission alleges that MCA made payments to Mark and Christopher Wolfington, who were corporate insiders and knew MCA was insolvent at the time of the transactions.  It also alleges that (some of) MCA's payments to Christopher Wolfington were on a loan he made to MCA (2d Am. Compl. ¶ 95), which would make him a creditor.  But the Commission does *not* allege any antecedent debt to Mark Wolfington—an essential element of the claim.  Accordingly, the Court concludes that the Commission has properly stated a preference claim only against Christopher, but not Mark, Wolfington.

### E.      Breach of Fiduciary Duty

The Commission alleges Christopher Wolfington breached his fiduciary duty of loyalty to MCA "by entering into loan transactions and diverting funds for [his] personal use that were not in the best interest of MCA."  (Id. ¶ 192.)  MCA challenges whether the Commission has standing to bring such a claim.  Creditors cannot bring direct claims for breach of fiduciary duty against a corporation's directors.  See NACEPF v. Gheewalla, 930 A.2d 92, 94 (Del. 2007).  Under the equitable standing doctrine, however, a creditor may bring a *derivative* action against an insolvent corporation.  Id.; see also Schoon v. Smith, 953 A.2d 196, 208 n.46 (Del. 2008) ("*Gheewalla* confers standing upon creditors to bring a derivative action where the corporation is insolvent, but only because the shareholders of an insolvent corporation no longer have an economic interest in the corporate entity—only its creditors have that interest.").  As a creditor of an insolvent corporation, the Commission has standing to bring a derivative claim for breach of fiduciary duty against MCA, which is what it purports to do.  (See 2d Am. Compl. ¶ 197 (pleading derivative standing).)  But, as MCA points out, a derivative claim only permits the Commission to recover *on MCA's behalf*—if it succeeds on this claim, the damages will go to MCA and not the Commission.

MCA also disputes whether the Commission has pleaded an essential element of a derivative claim:  a demand on the board of directors or futility of such a demand.  While the Commission did not plead any demand on the board, it has pleaded facts indicating such a demand would be futile.  Grounds for futility include that a majority of the board has a material financial or familial interest, King v. Verifone Holdings, Inc., 12 A.3d

1140, 1145 (Del. 2011), and one of MCA's two board members is the allegedly culpable party, Christopher Wolfington, and the other is his brother-in-law, who it also alleges was involved in self-dealing transactions, (2d Am. Compl. ¶¶ 53(c) & 190–96). Accordingly, the Court concludes the Commission has adequately pleaded a derivative claim for breach of fiduciary duty.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that MCA's Motion to Dismiss (Doc. No. 139) is **DENIED** and that Mark and Christopher Wolfington's Motion to Dismiss (Doc. No. 158) is **GRANTED IN PART** and **DENIED IN PART**. The Wolfingtons' Motion is Granted as to Count II of the Commission's Second Amended Complaint (Doc. No. 129) against Mark and Chris Wolfington and Count XI against Mark Wolfington only; those claims are **DISMISSED WITHOUT PREJUDICE**. In all other respects, the Wolfingtons' Motion is denied.

Dated:  September 30, 2013

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge