## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Corporate Commission of the Mille
Lacs Band of Ojibwe Indians,

|  |  |  |
|---|---|---|
|  | Plaintiff, | Civ. No. 12-1015 (RHK/LIB) |
|  |  | **MEMORANDUM OPINION AND ORDER** |
| v. |  |  |

Money Centers of America, Inc., et al.,

Defendants.

Jane E. Maschka, Michael M. Krauss, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Plaintiff.

Luke P. McLoughlin, Erin M. Carter, James L. Beausoleil, Jr., Duane Morris LLP, Philadelphia, Pennsylvania, Robert B. Patterson, Jr., Patterson Law Office, PA, Minnetonka, Minnesota, for Defendants.

## INTRODUCTION

This case arises out of a contract dispute between Plaintiff Corporate Commission of the Mille Lacs Band of Ojibwe ("the Commission") and Defendants Money Centers of America, Inc. and MCA of Wisconsin, Inc. (collectively "MCA"). The Commission asserted claims against MCA and its Chief Executive and Chief Operating Officers, Defendants Christopher and Mark Wolfington. The Court previously granted the Commission summary judgment on its breach-of-contract claim against MCA, the Commission dismissed its remaining claims against MCA, and the Court entered judgment against MCA. Only the Commission's claims against the Wolfingtons remain

pending.  The Commission now moves for partial summary judgment on its piercing-the-corporate-veil claim against Christopher Wolfington and on a fraudulent-transfer claim against Mark Wolfington.  Mark Wolfington also moves for summary judgment on the Commission's claims.  For the reasons set forth below, each Motion will be granted in part and denied in part.

## BACKGROUND

In 2009, the Commission and MCA entered into an agreement for MCA to provide cash-access services at the Commission's casinos ("the Agreement").  According to its terms, the Commission would advance MCA cash each day, MCA would distribute the cash to casino patrons in exchange for a check or debit, and four to six days later MCA would deduct its fees from the amount advanced and wire the balance back to the Commission.  Throughout the term of the Agreement, MCA consistently held the advances for longer than four to six days before settling with the Commission, causing the total amount MCA owed to the Commission on any given day to grow.  When the Commission terminated the Agreement in April 2012, MCA held approximately $5.6 million in outstanding advances, which it has yet to repay.

In July 2012, the Commission commenced the instant action against MCA seeking repayment of the $5.6 million.  During discovery, the Commission learned MCA was insolvent[1] and suspected the Wolfingtons were siphoning corporate funds for personal expenses.  The Commission joined Mark and Christopher Wolfington as Defendants, asserting nine claims against them:  breach of contract/piercing the corporate veil; unjust

---

[1] MCA only acknowledges that it was "balance-sheet" insolvent.

enrichment; conversion; constructive trust; fraud; two claims of fraudulent transfer;

preference; and breach of fiduciary duty (against Christopher Wolfington only).

In September 2013, the Court granted the Commission summary judgment on its

breach-of-contract claim against MCA and dismissed its unjust-enrichment claim (against

all parties) and its preference claim (against Mark Wolfington).  The Commission then

moved the Court to dismiss its remaining claims against MCA and enter judgment

against MCA, which the Court granted on December 2, 2013.[2]   Only the Commission's

claims against the Wolfingtons remain pending.  At issue in these Motions are the

breach-of-contract/piercing-the-corporate-veil claim against Christopher Wolfington and

four remaining claims against Mark Wolfington.[3]

The following facts are undisputed, unless otherwise noted.

**MCA's Structure, Finances, and Corporate Records**

MCA was incorporated in 1997 in Delaware and was a publicly traded company

registered with the Securities and Exchange Commission ("SEC") from 2005 through

2008.  Its current corporate status in Delaware is "void" because it has not paid the

required annual franchise tax since March 2010.  Christopher Wolfington is CEO and

---

[2] Although MCA subsequently appealed the judgment, this Court is satisfied that it retains jurisdiction over the claims against the Wolfingtons as the issues remaining are factually and legally distinct from the matters on appeal.  See Griggs v. Provident Consumer Disc. Co., 549 U.S. 56, 58 (1982) (per curiam) (district court is only divested of jurisdiction over "those aspects of the case involved in the appeal").

[3] The Court does not address the Commission's constructive-trust or conversion claims, as neither party raised these claims in their Motions.  Upon the Court's inquiry at oral argument, however, the Commission acknowledged that its constructive-trust claim was tied to its unjust-enrichment claim. (Hr'g Tr. 46).  As the unjust-enrichment claim has been dismissed, the Court will also dismiss the constructive-trust claim.

majority stockholder and his cousin Mark Wolfington is COO. MCA has two Directors: Christopher Wolfington and his brother-in-law Jonathon Ziegler. Since 2001, MCA has had eight other Directors. At the time it was registered with the SEC, MCA listed 47 full-time employees and between 2009 and 2012, it employed approximately 20 individuals at the Commission's casinos.

MCA has produced minutes for eight board meetings, all of which took place before May 2009. Ziegler, who has been on the board since 2007, could not recall being asked to approve any minutes for board meetings or receiving a copy of any minutes. He also did not know who served as secretary or treasurer, or if MCA had held any shareholder meetings (but he thought it "may have" when it was a public company). MCA has never paid dividends.

MCA maintains general ledgers and records its daily financial transactions. It filed independently audited financial statements when it registered as a public company in 2005 and, most recently, in December 2010. MCA's balance sheets show it has been insolvent since 2004, when it entered into a reverse acquisition and merger and was recapitalized. While the Wolfingtons acknowledge this, they contend the balance sheets are misleading because they reflect only the cost of MCA's assets and not their value; they maintain MCA is not insolvent. MCA's financial statements show it has suffered a net loss every year since 2004 except for 2009, in which it had a $1.2 million net gain. The Commission attributes this purported profit to MCA recording a $1.8 million contract-cancellation fee (that was never paid) as "revenue" when the Ho-Chunk Nation, a Native American tribe with casinos in Wisconsin, terminated its contract with MCA

and sued it for more than $5 million of outstanding advances, much like the Commission
did here.

Although the Wolfingtons dispute MCA's insolvency, its former comptroller, Bill
Brudecki, testified that Mark Wolfington "would choose which bills to pay" and he had
the impression that MCA could not pay all its bills as they came due.  (Brudecki Dep.
105–06.)  This is supported by correspondence among MCA's officers and between
MCA and its creditors.  For example, in May 2009, MCA's former CFO/COO Jay Walsh
wrote to Brudecki and others:

> Ok boys I have tried my best to hold this off, but I can[']t any longer
> Here are our obligations and I think we need to take from ho-chunk
> 1.  We have to pay mercantile[4] another 250k like asap
> 2.  Then pay ba[e]na[5] up on its interest, think we are 3 months behind
> 3.  Then need another 60k on top of that
> 4.  Then pay ba[e]na 250k after mille lacs

(Maschka Decl. Ex. R.)  The Commission alleges this email shows MCA was insolvent
and relying on cash advances from the casinos to pay its creditors instead of settling the
advances as promised.  In July 2009, a vendor emailed Christopher Wolfington regarding
an outstanding payment of $460,000.  (Id. Ex. Q.)  That same month, one of MCA's
creditors questioned why MCA's credit line had increased by $1.2 million more than its
cash; Walsh explained in an email to Brudecki and the Wolfingtons that the credit went
to pay other debts MCA owed:  "To answer where the 1.2 mil went . . . $750,000
paydown of debt (he won't like), rob peter to pay paul, but at least it went to him."  (Id.

---

[4] Mercantile is one of MCA's creditors.

[5] Baena is also one of MCA's creditors, owned by Christopher Wolfington's brother.

Ex. S.)  MCA's 2010 audited financial statement indicates it had defaulted on leases and owed approximately $330,000.  In December 2010, Brudecki explained MCA's financial situation to Mark Wolfington in an email, stating that if MCA "stopped business at midnight" and waited for all the checks and debits it received to clear, it would have a "shortfall due to the casinos in the ballpark of $2.6 million."  (Id. Ex. U.)   Mitchell Wolf, MCA's comptroller since 2011, estimated MCA is currently past due on $1 million worth of bills.  (Wolf Dep. 82, 92.)

The Commission contends that MCA profited from the Agreement, as MCA's fees exceeded its labor costs, and therefore should have been able to settle the Commission's advances without incident.  Therefore, the Commission attributes MCA's inability to repay its advances to misconduct of the Wolfingtons.  It contends the Wolfingtons were using the Commission's advances as personal lines of credit.  The Wolfingtons dispute any misconduct and contend that MCA's fees under the Agreement were not sufficient to cover MCA's overhead and it was therefore losing money on its business with the Commission.

**Christopher Wolfington's Use of Corporate Funds**

The Commission alleges Christopher Wolfington and MCA operated as a single economic unit.  In support of this assertion, it lists numerous transactions in which MCA's funds were used to pay for Christopher Wolfington's personal expenses.  For example, in May 2009, MCA wired $22,000 to his children's private school, and in August 2009, he paid for a family vacation to Greece using MCA's credit card.  The Commission alleges MCA has paid at least $50,000 toward his home mortgage or other

personal debt since 2009 and $107,000 to G&G Holistic, an addiction-treatment center which he utilized.  The Commission details more than $80,000 of charges on MCA's credit card it asserts were for his personal expenses, including charges at nightclubs, jewelers, luxury retailers, and a spa.  It also asserts MCA paid more than $20,000 to or on behalf of his relatives without receiving any services in return.

In addition to paying Christopher Wolfington's personal expenses and relatives, the Commission alleges MCA made several payments to him in excess of his salary and bonuses, either directly or through intermediaries.  MCA's bank records—which are separate from payroll—show more than $69,000 in direct payments to him, $25,000 of which were made after this litigation began.  The records also show payments to his personal assistant, which the Commission alleges were funneled back to him, and payments of $290,000 to another company he owns, Real Estate Empowered, for which the Commission alleges MCA received no value in return.  Finally, $20,000 of MCA's payments to G&G Holistic was "refunded" by G&G Holistic to Christopher Wolfington, not to MCA.

When asked about these payments and expenses (or MCA's insolvency) in his deposition and through interrogatories, Christopher Wolfington invoked the Fifth Amendment's protection against self-incrimination and refused to answer.  But, through others' testimony and corporate records, he has offered explanations for some (but not all) of the alleged siphoning.  First, he asserts many of the payments to him and for his personal expenses were charge-offs against a loan he made to MCA.  Under his employment contract with MCA, he is paid a base salary, a "guaranteed bonus," and

incentive bonuses for sales.  Each year, he has deferred payment of his guaranteed bonus

to an unspecified later date in order to conserve MCA's cash.  Brudecki testified that he

would record the deferred compensation as a personal loan from Christopher Wolfington

to MCA and would post Christopher Wolfington's expenditures against the loan if they

were not for business purposes.  The Commission responds by asserting such charge-offs

violated MCA's financing agreement with Baena, which prohibited MCA from paying

Christopher Wolfington the bonus.

Christopher Wolfington contends the payments to relatives were legitimate

because they were made in exchange for consulting services.  And he explains that the

payments to G&G Holistic were part of a short-lived business deal between it and MCA

or, to the extent they *were* to pay for his treatment there, they were legitimate medical

benefits provided by MCA as his employer.  He explains the $20,000 G&G Holistic

refunded to him was intended for MCA, but made payable to him as MCA's CEO.  (Hr'g

Tr. 29.)

### Mark Wolfington's Use of Corporate Funds

The Commission alleges Mark Wolfington siphoned approximately $100,000

from MCA since he joined as COO in 2010.  It identifies nine questionable transactions,

the most substantial of which was $63,000 in 2012 used to pay his personal taxes.  Mark

Wolfington contends this was a "business-related expense" because the Louisiana gaming

commission required him to be current on his tax obligations before licensing MCA to

operate there.  The $63,000 transaction is not documented in MCA's general ledger, but

Wolf (MCA's former comptroller) testified that this was because they had not yet

decided how to record the expense—as an advance on payroll or as a loan.  Mark

Wolfington contends the remaining $40,000 in payments were for legitimate business

expenses, such as bonuses and reimbursements for office supplies and travel expenses.

He has not produced any documentation substantiating these alleged reimbursements or

bonuses, despite a corporate policy requiring employees to fill out a form detailing

expenses when submitting them for reimbursement.

### The Instant Motions

The Commission and Mark Wolfington now move for summary judgment.  The

Commission moves for summary judgment on its piercing-the-corporate-veil claim

against Christopher Wolfington and its fraudulent-transfer claim against Mark

Wolfington.  Mark Wolfington moves for summary judgment on all of the Commission's

claims against him.  The Motions have been fully briefed, the Court heard oral

arguments, and they are now ripe for disposition.

### STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557

U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042

(8th Cir. 2011) (en banc).  The Court must view the evidence, and the inferences that may

be reasonably drawn from it, in the light most favorable to the nonmoving party.  Beard

v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885,

892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified. When considering the Commission's Motion, the Court views the record in the light most favorable to MCA, and when considering MCA's Motion, the Court views the record in the light most favorable to the Commission. "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011) (per curiam).

## ANALYSIS

### I.   Breach of Contract/Piercing the Corporate Veil

Generally, a corporation's shareholders or officers are not liable for its debts and "a plaintiff seeking to persuade a . . . court to disregard the corporate structure faces a 'difficult task.'" NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir. 2008) (quotation omitted) (applying Delaware law). Nonetheless, courts may pierce the corporate veil and hold an individual accountable "where there is fraud or where the corporation is in fact a mere instrumentality or alter ego of its owner." Id. (quotation omitted). To prevail on an alter-ego theory under Delaware law, a plaintiff must prove (1) the individual and the corporation "operated as a single economic entity" and (2) an

"overall element of injustice or unfairness."  Id. at 177.  Factors relevant to the first prong

of the test include:

> [W]hether the corporation was adequately capitalized for the corporate
> undertaking; whether the corporation was solvent; whether dividends were
> paid, corporate records kept, officers and directors functioned properly, and
> other corporate formalities were observed; whether the dominant
> shareholder siphoned corporate funds; and whether, in general, the
> corporation simply functioned as a façade for the dominant shareholder.

Id.  No single factor is determinative; rather the plaintiff must prove some combination of

them.  Id.  The second prong may be satisfied by a showing that the individual "unfairly

disregarded the rights of [the corporation's] creditors" or engaged in fraudulent or "unfair

siphoning of [the corporation's] assets."  Id. at 184.

The Commission alleges both Christopher and Mark Wolfington disregarded the

corporate form and used MCA to engage in fraud.  It alleges they induced the

Commission and others to transfer MCA money, knowing it would not be able to repay in

full, "and then spent it as [their] own."  (Pl.'s Mem. in Supp. at 21.)

**A.  Christopher Wolfington**

Determining whether to pierce the corporate veil is a "fact-intensive inquiry" that

is usually best left to a jury, Winner Acceptance Corp v. Return On Capital Corp., No.

3088-VCP, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008), and this case is no

exception.  While the Commission has put forth substantial evidence to support its claim

against Christopher Wolfington (sufficient to submit the issue to a jury), the record is not

so clear cut as to warrant summary judgment in the Commission's favor.

The Commission has established several factors showing Christopher Wolfington and MCA functioned as a single unit. MCA did not pay dividends to shareholders. It did not consistently observe corporate formalities, as evidenced by MCA's scant proof of board or shareholder meetings and its "void" corporate status in Delaware. Although denied by Defendants, MCA is insolvent and was throughout the course of the Agreement. Under Delaware law, a corporation is presumed insolvent if it is "not paying debts as they become due." 6 Del. Code § 1302(b). The Commission has proved MCA was unable to pay its debts since at least 2009 through testimony that Mark Wolfington had to "choose" which bills to pay, correspondence from May 2009 acknowledging MCA was behind on payments to several creditors, its inability to timely settle the Commission's advances throughout the Agreement, and its inability to satisfy the judgment against it in the instant action, and Defendants have not offered any evidence to rebut this presumption.

It remains disputed, however, whether Christopher Wolfington was siphoning money and unfairly disregarding the rights of MCA's creditors. The record certainly reflects a comingling of Christopher Wolfington's personal finances with MCA's finances. But it does not conclusively establish he was siphoning money from MCA. Viewing the evidence in the light most favorable to him, a jury could reasonably conclude that he deferred a portion of his income in order to keep MCA afloat while it was undergoing financial difficulty and that many of the transactions labeled as "siphoning" were in fact charge-offs against what it owed him or were legitimate business expenses, such as the payments to G&G Holistic, his family members, and Real

Estate Empowered.  Some of MCA's transactions remain unexplained, but standing alone they are insufficient grounds upon which to grant the Commission summary judgment.[6]

## B.  Mark Wolfington

While the Commission has presented substantial evidence that Christopher Wolfington and MCA functioned as a single economic unit, the same cannot be said of Mark Wolfington.  Mark Wolfington is not a director or shareholder of MCA and therefore is not implicated in MCA's failure to observe many corporate formalities, such as board or shareholder meetings or its nonpayment of dividends.  Moreover, he did not become a corporate officer until 2010.  The Commission has alleged few facts demonstrating that he controls or dominates MCA.  In fact, its only allegation specific to

---

[6] In its Memorandum, the Commission relies heavily on Christopher Wolfington invoking the Fifth Amendment as a basis for granting summary judgment against him. The Fifth Amendment protects an individual from answering questions "where the answers might incriminate him in future criminal proceedings." Baxter v. Palmagiano, 425 U.S. 308, 316 (1976).  In a criminal case, a defendant's invocation of the Fifth Amendment may not be used against him.  The same is not true, however, in a civil case, where an adverse inference may be drawn under appropriate circumstances.  Id. at 318.  The Commission acknowledges that a direct inference of liability based solely on a defendant's silence is impermissible, but argues that such an inference is appropriate where, as here, the plaintiff has produced corroborative evidence of wrongdoing. (Pl.'s Mem. in Supp. at 22 (citing United States v. Nagelberg, 772 F. Supp. 120, 123 (E.D.N.Y. 1991) (court drew adverse inference of liability where plaintiff presented corroborative evidence in support of claim and defendants invoked the Fifth Amendment and had not "offered a shred of evidence in support" of their position)).)  However, courts only draw such a negative inference when necessary to avoid unfair prejudice to the plaintiff.  For example, an adverse inference is appropriate when there is no alternative means of proof available to the plaintiff, other than the defendant's testimony. DirectTV, Inc. v. Lovejoy, 366 F. Supp. 2d 132, 138 (D. Me. 2005). Likewise, if a plaintiff produces probative evidence of wrongdoing, "the [defendant's] claim of privilege will not prevent an adverse finding or even summary judgment if the [defendant] does not present sufficient evidence" to satisfy his burden.  JSC Foreign Econ. Ass'n Tecnostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461, 464 (S.D.N.Y. 2005). Here, Christopher Wolfington has offered information from other sources sufficient to create a genuine issue of fact on the Commission's piercing claim; as a result, no adverse inference of liability by the Court is necessary (although, as Wolfington concedes, a jury may draw such an inference at trial).

Mark Wolfington is that MCA made eight purportedly fraudulent transfers to him, totaling $100,000. While this might be evidence of officer misconduct, it is a far cry from the sort of exploitation or abuse of the corporate form which justifies piercing the corporate veil and holding him liable for MCA's breach. Accordingly, the Court will grant Mark Wolfington's Motion on this claim.

## II.    Fraudulent Transfer Against Mark Wolfington

### A.  Constructive Intent

Under Delaware law, a transfer is fraudulent as to a creditor if the debtor: (1) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small" or "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due," and (2) made the transfer "[w]ithout receiving a reasonably equivalent value in exchange." 6 Del. Code § 1304(a)(2). The Commission alleges Mark Wolfington received—in addition to his salary—eight transfers, totaling $104,521.30, from MCA between 2011 and 2013. It alleges each of these transfers was fraudulent because MCA did not receive reasonably equivalent value and MCA was both engaged in business for which its remaining assets were unreasonably small and intended to incur (or reasonably should have believed it would incur) debts beyond its ability to pay as they became due.

The Commission has put forth substantial evidence, largely unrebutted, to meet the first prong of the test. MCA was, at the time, insolvent and there are records and testimony indicating it knew it would be unable to pay the debts it was incurring. The

second prong—reasonably equivalent value—must be analyzed as to each transaction.

To determine whether an entity received reasonably equivalent value, a court first

determines whether the entity received any value at all.  In re R.M.L., Inc., 92 F.3d 139,

149 (3d Cir. 1996).  If it did, then the court must determine, considering the totality of the

circumstances, whether the value was "reasonably equivalent."  Id.  The Commission

alleges MCA received *no* value in exchange for any of the eight transfers, while

Wolfington contends that each was a legitimate business expense.

The largest of the eight allegedly fraudulent transfers was $63,000 in June 2012.

It is undisputed that this transfer was to pay Mark Wolfington's personal taxes.

Wolfington argues this was a business expense because the Louisiana Gaming

Commission required MCA's officers to be current on their taxes before it would license

MCA to operate in its casinos.  He argues MCA received value in exchange for the

payment when MCA earned profits from its operations in Louisiana casinos.  But he had

a preexisting duty to pay his personal taxes (see Hr'g Tr. 30) and MCA therefore received

no value in exchange.  Cf. Williams Iselin & Co. v. Boardwalk Regency Corp., 703 F.

Supp. 2d 1084, 1087 (S.D.N.Y. 1989) (corporation received no benefit in exchange for

payment of insider's gambling debt).  As he has not identified any other value he

provided MCA in exchange for the transfer, the Court concludes MCA received no value

in exchange for the $63,000 transfer and will grant the Commission summary judgment

on this claim.

The other transfers are not as clear-cut.  They were recorded in MCA's general

ledger as various business expenses using accounting codes, but Wolfington has not

provided any further explanation or validation of their alleged purposes, even in his declaration purporting to attest to their legitimacy.  For example, he states in his declaration:  "On September 28, 2011, I received $6,000 from MCA.  This payment is listed on MCA's books as a payroll bonus payment."  (M. Wolfington Decl. ¶ 6.)  He provides no information as to what the purported bonus was compensating him for, nor any employment agreement pursuant to which it was paid.  His statements regarding the other six transfers are nearly identical, averring that five are on the books as "payroll payments" and one as an "expense reimbursement for travel expenses and other business expenses."  (M. Wolfington Decl. ¶¶ 5–11.)  He offers no explanation why the "payroll payments" did not go through payroll, nor does he explain the purpose, destination, or date of the "travel" he was reimbursed for.  With so little evidence, the Court cannot conclude whether MCA received any value—much less reasonably equivalent value—in exchange for the seven remaining transfers.  Accordingly, the Court will deny both parties' Motions for summary judgment on this claim, leaving the question of Wolfington's credibility to a jury.

## B. Actual Intent

Mark Wolfington also moves for summary judgment on the Commission's claim for fraudulent transfer with actual intent.  In this claim, the Commission again alleges the eight transfers[7] to Mark Wolfington (discussed above) were fraudulent.    Under

---

[7] The Commission also contends—for the first time—that Mark Wolfington's salary should be avoided as fraudulent.  However, the Commission provides no legal support for this contention and it presents no evidence contradicting Mark Wolfington's defense that he is a bona fide employee and MCA has paid his salary in good faith as compensation for his professional

Delaware law, a transfer is fraudulent as to a creditor if the debtor made the transfer with "the actual intent to hinder, delay or defraud" any of its creditors.  6 Del. Code § 1304(a)(1).  Actual intent may be proved through the presence of several "badges of fraud" listed in the statute.  § 1304(b); <u>Max Sugarman Funeral Home, Inc. v. A.D.B. Investors</u>, 926 F.2d 1248, 1254–55 (1st Cir. 1991) ("[T]he confluence of several [badges] can constitute conclusive evidence of an actual intent to defraud.").  The Commission alleges six of the eleven listed badges of fraud apply here.

First, it is undisputed the transfers were to an insider, as "insiders" include officers of the debtor corporation.  Second, the Commission alleges the transfers were concealed.  Although it acknowledges they were recorded in MCA's general ledger, it asserts the entries were too vague and did not comport with MCA's reimbursement-request policy.  Third, it asserts the transfers were made after MCA had been sued because another tribe, the Ho-Chunk Nation, sued MCA on June 17, 2010, for its alleged failure to repay more than $5 million.  Fourth, it alleges MCA did not receive reasonably equivalent value (as discussed above).  Fifth, it alleges MCA was insolvent.  Sixth, the transfers occurred shortly after substantial debts were incurred—namely the $5 million it allegedly owed the Ho-Chunk Nation and the $5.6 million it owed the Commission.  These allegations, together with the evidence the Commission has presented in support of each, are sufficient for a jury to reasonably conclude the transfers to Mark Wolfington were made with an actual intent to hinder, delay, or defraud creditors.

---

services.  Accordingly, the Court will grant summary judgment in favor of Mark Wolfington on this portion of the Commission's claim.

If the Commission were to prove he acted with actual intent, Mark Wolfington could nonetheless avoid liability if he proves he acted in good faith and MCA received reasonably equivalent value in exchange for the transfers.  6 Del. Code § 1308(a).  He has not presented conclusive evidence demonstrating either of these—much less both—and accordingly, the Court will deny his Motion and leave this claim for a jury.

## III.    Fraud

Mark Wolfington moves for summary judgment on the Commission's fraud claim, arguing it is untenable now that the Commission's fraud claim against MCA has been dismissed.  In support of this argument, he relies upon the Court's previous Order denying his motion to dismiss the claim because the Court had already determined the Commission properly stated a claim for fraud against MCA and a claim for piercing the corporate veil against him, so by extension, it had properly stated a claim for fraud against him.  Mark Wolfington now contends that the *converse* of this statement must also be true—namely, because the Commission no longer has a claim for fraud against MCA or for piercing the corporate veil against him, it no longer has a fraud claim against him.

But piercing the corporate veil is only *one* of the theories upon which the Commission may base its claim.  Under such a theory, it seeks to hold him liable for the corporation's fraud.  But it may seek to hold him liable for his individual involvement in the fraud as well, regardless of whether he was acting in his capacity as a corporate officer.  See Ransom v. VFS, Inc., 918 F. Supp. 2d 888, 894 (D. Minn. 2013) (Tunheim, J.) ("It is the universal rule that an officer of a corporation who takes part in the

- 18 -

commission of a tort by the corporation is personally liable therefor.") (quotation
omitted) (applying Minnesota law); St. James Recreation, LLC v. Rieger Opportunity
Partners, LLC, No. Civ. A. 19346, 2003 WL 22659875, at *6 (Del. Ch. Nov. 5, 2003)
("The default common-law rule is that corporate officials may be held individually liable
for their tortious conduct, even if undertaken while acting in their official capacity.  This
rule applies to claims of fraud, whether based on intentional or negligent
misrepresentation.") (footnotes omitted).  Accordingly, the Commission may continue to
pursue its claim of fraud against Mark Wolfington based on alleged misrepresentations *he*
made regarding the reason for MCA's delayed payments.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS
ORDERED** that the Commission's Motion for Partial Summary Judgment (Doc. No.
257) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** as
to Count X (Fraudulent Transfer—Constructive Intent) of the Second Amended
Complaint (Doc. No. 129) against Defendant Mark Wolfington as to MCA's June 12,
2012, transfer of $63,000 to Mark Wolfington for the payment of his taxes.  The Motion
is **DENIED** as to Count I (Breach of Contract/Piercing the Corporate Veil) against
Defendant Christopher Wolfington and as to Count X (Fraudulent Transfer—
Constructive Intent) regarding MCA's other allegedly fraudulent transfers to Mark
Wolfington.  **IT IS FURTHER ORDERED** that Defendant Mark Wolfington's Motion
for Summary Judgment (Doc. No. 261) is **GRANTED IN PART** and **DENIED IN
PART**.  That Motion is **GRANTED** as to Count I (breach of contract/piercing the

corporate veil) of the Second Amended Complaint (Doc. No. 129), which is

**DISMISSED WITH PREJUDICE**, and as to Count IX (Fraudulent Transfer—Actual

Intent) regarding MCA's payment of Mark Wolfington's salary.  In all other respects, the

Motion is **DENIED**.

Dated:  February 18, 2014                                       s/Richard H. Kyle
                                                               RICHARD H. KYLE
                                                               United States District Judge